124 F.3d 82
 31 Bankr.Ct.Dec. 338
 Robert CORBETT; Alexander Roca; Peter Furtado; Dennis
Farrell, as Trustees and Fiduciaries of the
Teamsters Local 814 Pension Fund,
Plaintiffs-Appellants,
v.
MacDONALD MOVING SERVICES, INC., Defendant-Appellee.
 No. 1459, Docket 96-9413.
 United States Court of Appeals,
Second Circuit.
 Argued June 2, 1997.
Decided Aug. 8, 1997.
 
 Eugene S. Friedman, Friedman & Levine (William K. Wolf, William Anspach, on the brief), New York City, for Plaintiffs-Appellants.
 Mark A. Stull (Douglas J. Pick, Pick & Halperin, LLP, New York City, on the brief), Boston, MA, for Defendant-Appellee.
 Before: MESKILL, JACOBS, and LEVAL, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 A Chapter 11 debtor in bankruptcy, Santini Brothers, Inc. ("Santini"), ceased doing business in 1991 and laid off its employees, thereby incurring statutory "withdrawal liability" to the Teamster Local 814 Pension Fund, an ERISA multi-employer pension plan. See 29 U.S.C. §§ 1381-1405. Santini and the parent company that owns 100% of its stock--MacDonald Moving Services, Inc. ("MacDonald")--undertook in Santini's confirmed Plan of Reorganization to pay to the Fund, on specified terms, the amount of withdrawal liability that was estimated in the Fund's Proof of Claim; and the Plan of Reorganization discharged the parent as well as Santini in respect of the withdrawal obligation. Prior to the June 1992 confirmation of the Plan of Reorganization, the amount of the withdrawal liability was recalculated and found to be substantially greater, but no amended Proof of Claim was filed. Nothing has been paid to the Fund by Santini or MacDonald.
 
 
 2
 In this lawsuit, the trustees and fiduciaries of the Fund sued MacDonald to collect the full, recalculated amount of the withdrawal liability. In October 1996, the United States District Court for the Eastern District of New York (Amon, J.) denied the Trustees' motion for summary judgment, and granted MacDonald's summary judgment motion on the ground of res judicata, thereby limiting MacDonald's withdrawal obligation to the undertakings in the Plan of Reorganization. The Trustees appeal, raising much the same issues they raised before the district court.
 
 
 3
 We affirm.
 
 BACKGROUND
 I. Factual Background
 
 4
 The facts are undisputed. Santini and Teamsters Local 814 ("Local 814") were parties to collective bargaining agreements under which Santini made periodic contributions to the ERISA Fund, a multi-employer plan within the meaning of 29 U.S.C. §§ 1002(37) and 1301(a)(3). The Fund was formed pursuant to an Agreement and Declaration of Trust between Local 814 and several employers of the participants; its purpose is to collect and invest employer contributions in order to provide employee benefits. Appellants Robert Corbett, Alexander Roca, Peter Furtado, and Dennis Farrell are the trustees and fiduciaries of the Fund (collectively, the "Trustees"), as well as the sponsors of the pension plan established and maintained by the Fund.
 
 
 5
 Appellee MacDonald is a corporation that has at all relevant times owned 100% of Santini's stock. MacDonald and Santini are therefore under common control within the meaning of I.R.C. §§ 414 and 1563, 26 U.S.C. §§ 414 and 1563, and constitute a single employer pursuant to 29 U.S.C. § 1301(b)(1).
 
 
 6
 On April 15, 1991, Santini filed a voluntary petition in bankruptcy under Chapter 11, 11 U.S.C. § 1101 et seq., in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") (Chapter 11 Case No. 91-22419). On September 1, 1991, Santini began laying off employees who were represented by Local 814, and the Trustees soon thereafter determined that Santini had permanently ceased all covered operations under the Fund. In accordance with the procedures in the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1101-1461 (amending ERISA), the Trustees calculated Santini's withdrawal liability, and on October 22, 1991 (nine days before the specified bar date) filed a general unsecured claim with the bankruptcy court in the amount of $138,985, representing Santini's as-then-calculated withdrawal liability.
 
 
 7
 In February 1992, the Trustees sent letters to MacDonald and Santini, advising of their determination that Santini had permanently ceased all covered operations under the Fund on or about December 27, 1991, stating that MacDonald and Santini were under common control, and demanding that the withdrawal liability be paid in full by April 1, 1992. The letters computed the withdrawal liability at $138,985, but added that the amount was subject to recalculation:
 
 
 8
 [t]he withdrawal liability was calculated based upon the latest actuarial valuation available at the time of Santini's withdrawal. The Trustees reserve the right to redetermine the company's liability upon completion of the July 1, 1991 actuarial valuation, and adjust the company's liability accordingly.
 
 
 9
 MacDonald timely received that letter.
 
 
 10
 On March 5, 1992, Santini's bankruptcy counsel responded to both letters, acknowledged that Santini and MacDonald were under common control and were therefore jointly responsible for each other's withdrawal liability, and stated that the joint liability would be taken care of in the Plan of Reorganization:
 
 
 11
 Santini is sensitive to the fact that it will be responsible for payment of withdrawal liability to the Fund. Accordingly, it would like to provide for same within its Plan of Reorganization rather than burden MacDonald with payment of the entire amount. Santini's Plan of Reorganization concentrates on both the Santini and MacDonald operations and is relying on the excess cash flow produced by both businesses to fund the Plan.
 
 
 12
 With regard to the Fund, the Plan would provide for payment of the amount due in equal monthly installments, with interest, termed out over sixty (60) months. With the exception of providing for the Fund, Santini's Plan of Reorganization is ready to file. Therefore, we would like to resolve this matter as quickly and as efficiently as possible so that we can make provisions for the Fund and file the Plan with the Bankruptcy Court.
 
 
 13
 On March 25, 1992, the Trustees sent Santini and MacDonald written demand for payment of recalculated withdrawal liability in the amount of $308,815, to be paid in five quarterly installments beginning on May 1, but no amended Proof of Claim was submitted to the Bankruptcy Court. It appears that neither Santini nor MacDonald ever responded to the Trustees' demands, or initiated ERISA arbitration pursuant to 29 U.S.C. § 1401(a)(1). On June 19, 1992, the Trustees sent out another pair of letters, noting that the May 1 payment had not been received.
 
 
 14
 On June 25, 1992, the Bankruptcy Court entered its Order confirming the Plan of Reorganization filed by Santini (the "Reorganization Plan" or the "Santini Plan"). The Santini Plan includes a provision that the withdrawal liability claim will be paid out of the "combined excess cash flow" of both Santini and MacDonald. Reorg. Plan § 4.8. Section 13.2 indicates that the Plan discharges all debts and claims against Santini and its affiliates; § 14.16 effects the release of all claims against Santini and its affiliates.
 
 
 15
 The Trustees took no appeal from the Bankruptcy Court's confirmation order.
 
 
 16
 About eight months after confirmation of the Reorganization Plan, in March 1993, the Trustees sent for filing in the Bankruptcy Court a "First Amended Proof of Claim" reflecting a withdrawal liability in the amount of $308,815. To date, neither Santini nor MacDonald has made any withdrawal liability payments.
 
 II. Procedural Background
 
 17
 The complaint in this action seeks to recover Santini's withdrawal liability from MacDonald, its now-dissolved parent company, MacDonald Moving & Storage, Inc., and Pasquale Santini.[1] The action was filed on October 28, 1992--three months after the Santini plan was confirmed and over four months before the Trustees filed their amended Proof of Claim.
 
 
 18
 On June 1, 1993, the Trustees moved for summary judgment against MacDonald in the amount of $308,315, plus interest, liquidated damages, and attorney's fees and costs. The Trustees argued that because neither MacDonald nor Santini initiated arbitration after the Trustees assessed the amount owed for withdrawal liability, MacDonald had waived its right to challenge the revised withdrawal liability.
 
 
 19
 MacDonald cross-moved for summary judgment limiting its liability to the terms set forth in the Reorganization Plan. MacDonald argued that the Trustees' claim was barred because the Plan discharged MacDonald's liability as well as Santini's, and because the Trustees did not challenge the bankruptcy court's power to foreclose their claim against MacDonald. In opposition, the Trustees argued, inter alia, that the Santini Plan did not purport to discharge creditors' claims against MacDonald, and that even if and to the extent that the Plan did purport to do so, the Order of Confirmation lacks res judicata effect, because: 1) bankruptcy courts lack jurisdiction to discharge third-party nondebtors; 2) ERISA claims are outside Bankruptcy Court jurisdiction because they are not "core" proceedings under 28 U.S.C. § 157(b); 3) the amount of the claim was unascertainable, and therefore the claim was not ripe for adjudication until after the confirmation; and 4) the public policy interests served by ERISA and the Bankruptcy Code outweigh the finality interest served by the doctrine of res judicata.
 
 
 20
 On October 23, 1996, Judge Amon entered a judgment granting MacDonald's motion for summary judgment and denying the Trustees' motion.
 
 DISCUSSION
 
 21
 It is uncontested that under the common control doctrine, MacDonald is jointly and severally liable for Santini's withdrawal liability. By virtue of 29 U.S.C. § 1301(b)(1) of ERISA and applicable regulations at 26 C.F.R. §§ 1.414(c)-1 through 1.414(c)-5, all businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another. The result in this case therefore turns on whether the Santini Plan purported to discharge the Trustees' claim for withdrawal liability against MacDonald, and if so, whether such discharge has res judicata effect.
 
 
 22
 I. Discharge of Withdrawal Liability Under the Terms of the Plan
 
 
 23
 The Trustees' claim in bankruptcy is referenced in the Santini Plan as the "Local 814 Claim." Section 2.2(g) of the Plan designates the "Local 814 Claim" as a creditor class, and § 4.8 provides that the "Local 814 Claim is to be paid in equal monthly installments over a 60-month period from the combined excess cash flow of Santini and MacDonald[ ]."[2] Because the Trustees had filed a Proof of Claim totalling $138,985 prior to the specified bar date (October 31, 1991), and no one had objected, the Local 814 claim was an "Allowed Claim" for that amount. Reorg. Plan § 1.3, 1.4.
 
 
 24
 Section 13.2 of the Santini Plan effectively included MacDonald in the scope of the bankruptcy discharge by providing that confirmation of the Plan
 
 
 25
 operate[s] as a discharge, pursuant to Bankruptcy Code Section 1141(d)(1) ..., of any and all debts or Claims against the Debtor, present and former officers and directors of the Debtor and against any Person which/who is an Insider or Affiliate of the Debtor that arose at any time before Confirmation ... whether accrued before, on, or after the Filing Date. On the Effective Date, as to every discharged debt and Claim, the Creditor that held such debt or Claim shall be precluded from asserting against New Santini [the reorganized company] or against New Santini's assets or properties, any other or further Claim based upon any ... activity ... that occurred prior to the Confirmation Date.
 
 
 26
 (Emphasis added.) The Trustees focus on the second quoted sentence, and argue that the preclusionary effect of § 13.2 is limited to claims against the post-reorganization corporation designated "New Santini." But that reading ignores the prior sentence, which provides that confirmation of the Plan operates as a discharge of (inter alia ) pre-Confirmation "claims" against an "Affiliate of the Debtor." The Code defines an "affiliate" as an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor.... " 11 U.S.C. § 101(2)(A). MacDonald is therefore an Affiliate, and is in the class of persons that § 13.2 purports to discharge.
 
 
 27
 Section 14.16 of the Santini Plan recites the terms of release:
 
 
 28
 [The rights afforded to claimholders] shall be in exchange for, and in complete release, satisfaction, and discharge of, all Claims against the Debtor and against any person which/who is an insider or affiliate of the Debtor, and acceptance of such distributions under the Plan shall be deemed irrevocably to release any and all Claims of any type, kind or nature against the Debtor and any of its respective ... Affiliates .... Creditors deemed to have released Claims ... shall be forever precluded from asserting against the Debtor, Reorganized Debtor and any of the Persons enumerated above in this Section ... or their Assets, any Claim of the type released or deemed released herein.
 
 
 29
 (Emphasis added.) The Trustees argue that under the language of § 14.16, there was no release of their claims because, although the Trustees gained rights in the Santini Plan, no distributions have been made in respect of the Local 814 Claim. Having received nothing, and therefore "accepted" nothing, the Trustees argue that they cannot be deemed to have released their claim. We disagree for the reasons adduced by the district court. The acceptance of distributions is one circumstance effecting a release of the Debtor and its Affiliates; but the grant of rights to claimholders under the Santini Plan is another. The Trustees' reading would allow "creditors [to] frustrate the bankruptcy proceedings and defeat a confirmed Plan by simply refusing to accept their allotted distributions." Dist. Ct. Op. at 11. Moreover, a reading that conditions the release on acceptance of distributions is inconsistent with the terms of discharge under § 13.2, which contains no such condition. Id.
 
 
 30
 The Trustees also argue, as they did in the district court, that the terms of the Santini Plan must be read in light of 11 U.S.C. § 524(e), which provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." The Trustees cite a number of cases for the proposition that § 524(e) prevents a third-party nondebtor from claiming the benefits of a general discharge granted to a debtor, see, e.g., Teamsters Joint Council No. 83 v. CenTra, Inc., 947 F.2d 115 (4th Cir.1991); McDonald v. Centra, Inc., 946 F.2d 1059 (4th Cir.1991), and argue that any discharge of MacDonald would exceed the Bankruptcy Court's power. To the extent that the Trustees are arguing that in light of the Centra and other cases, the Bankruptcy Court could not have intended to discharge MacDonald, the plain language of the Plan says otherwise. To the extent that the Trustees are attempting to challenge the Bankruptcy Court's power to discharge MacDonald, this argument must also fail, because we agree with the district court that res judicata ultimately bars the Trustees' challenge to the terms of the Santini Plan, including its discharge of MacDonald. See generally Republic Supply Co. v. Shoaf, 815 F.2d 1046 (5th Cir.1987).
 
 
 31
 II. Res Judicata Effect of the Bankruptcy's Court's Discharge
 
 
 32
 To determine whether the doctrine of res judicata bars a subsequent action, we consider whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same. In re Teltronics Servs., Inc., 762 F.2d 185, 190 (2d Cir.1985). In the bankruptcy context, we ask as well whether an independent judgment in a separate proceeding would "impair, destroy, challenge, or invalidate the enforceability or effectiveness" of the reorganization plan. Sure-Snap Corp. v. State Street Bank and Trust Co., 948 F.2d 869, 875-76 (2d Cir.1991). This last inquiry may also be viewed as an aspect of the test for identity of the causes of action. See Herendeen v. Champion Int'l Corp., 525 F.2d 130, 133 (2d Cir.1975). The Trustees do not contest that the confirmation by the bankruptcy court resulted in a final judgment on the merits, and that the litigants are the same parties. We address the remaining questions in order.
 
 A. Court of Competent Jurisdiction
 
 33
 The district court assumed arguendo that the bankruptcy court lacked the power to release a third-party nondebtor under § 524(e), and concluded that the judgment was entitled to res judicata effect nevertheless. The district court began with the general rule that any party to a cause of action may challenge a federal court's subject matter jurisdiction at any stage of the proceedings, including of course on direct appeal. See Dist Ct. Op. at 15 (citing Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 701-02, 102 S.Ct. 2099, 2103-04, 72 L.Ed.2d 492 (1982)). However, because the Trustees raised no jurisdictional challenge during the bankruptcy proceedings, and took no appeal from the bankruptcy court's order discharging MacDonald, the present action is a collateral attack on Bankruptcy Court's jurisdiction. As the district court concluded,
 
 
 34
 [c]ollateral attacks on a court's subject matter jurisdiction are barred by the doctrine of res judicata. See Stoll [v. Gottlieb, 305 U.S. 165, 172, 59 S.Ct. 134, 137, 83 L.Ed. 104 (1938) ] (after prior court ruled on subject matter jurisdiction, a subsequent court where res judicata is pleaded as to previous court's jurisdiction [is] preclude[d] ... from revisiting the issue); Durfee v. Duke, 375 U.S. 106, 116, 84 S.Ct. 242, 247-48, 11 L.Ed.2d 186 (where defendant explicitly challenges state court's subject matter jurisdiction over land dispute, finding that land was in state and thus under court's jurisdiction was unassailable by collateral attack).
 
 
 35
 Dist. Ct. Op. at 16.
 
 
 36
 The Trustees contend that res judicata can never foreclose the question of subject matter jurisdiction. We disagree. "Every court in rendering a judgment tacitly, if not expressly, determines its jurisdiction over the parties and the subject matter." Stoll v. Gottlieb, 305 U.S. 165, 171-72, 59 S.Ct. 134, 137, 83 L.Ed. 104 (1938). Moreover, "[a]fter a Federal court has decided the question of the jurisdiction over the parties as a contested issue, the court in which the plea of res judicata is made has not the power to inquire again into that jurisdictional fact." Id. at 172, 59 S.Ct. at 137. In subsequent cases, the Supreme Court has extended the rule of Stoll beyond instances in which the question of subject matter jurisdiction was contested and decided in the prior proceeding. In Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 377-78, 60 S.Ct. 317, 320, 84 L.Ed. 329 (1940), the jurisdictional issue had not been raised in district court (sitting in bankruptcy) during the first proceeding; the district court's judgment commanded res judicata effect nonetheless, because there could "be no doubt that if the question ... had actually been raised and decided ... that determination would have been final save as it was open to direct review on appeal."[3] The governing principle is well settled:
 
 
 37
 A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not ... reopen that question in a collateral attack upon an adverse judgment. It has long been the rule that principles of res judicata apply to jurisdictional determinations--both subject matter and personal.
 
 
 38
 Compagnie des Bauxites, 456 U.S. at 702 n. 9, 102 S.Ct. at 2104 n. 9 (emphasis added).
 
 
 39
 Relying on Stoll, other Courts of Appeals have concluded that creditors may not collaterally attack bankruptcy subject matter jurisdiction. See Trulis v. Barton, 107 F.3d 685, 691 (9th Cir.1995) ("Creditors who do not wish to release third party debtors pursuant to the principal debtor's plan of reorganization should object to confirmation of the plan on the ground that such a plan provision is violative of section 524 and not within the power, even jurisdiction, of the bankruptcy court.... The point is that only a direct attack is available and collateral attack is unavailable.") (quoting 5 Collier on Bankruptcy p 1141.01 (15th ed.1995)); Shoaf, 815 F.2d at 1052-53 (even if 524(e) precluded bankruptcy court from releasing guarantor, confirmation order is still res judicata where creditor neither objected to nor appealed from confirmation of bankruptcy plan). See also 18 Wright and Miller § 4428, at 282 (1981 ed.) ("[I]t seems clear that federal court judgments are binding notwithstanding a simple lack of subject matter jurisdiction, without regard to whether the jurisdictional question was litigated.").
 
 
 40
 When a bankruptcy court approves a plan of reorganization involving persons over whom the court has personal jurisdiction, and adjusts the debts and obligations among the debtor, the debtor's parent companies, and its creditors, all persons present and having an opportunity to challenge the bankruptcy court's jurisdiction to approve or implement each component of the plan must raise subject matter jurisdiction at that time or on direct appeal or not at all. The Trustees had that opportunity, and they could make no credible representation to the contrary.[4]
 
 
 41
 The Trustees contend that the district court's reasoning (which we have adopted) creates a circularity problem: if the bankruptcy court potentially lacked subject matter jurisdiction to discharge MacDonald, then how can one determine that the bankruptcy court was a "court of competent jurisdiction" for purposes of res judicata without considering the merits of the jurisdictional challenge? There may be circumstances in which a bankruptcy court lacks competent jurisdiction, such as where it acts as a traffic court or a court of domestic relations. But we are not faced with a situation in which a bankruptcy court has expunged the points on a debtor's driver's license or annulled her marriage, nor are we evaluating a question of jurisdiction over a person or a res. Here, the bankruptcy court exercised powers that are within its competent jurisdiction: e.g., confirm a plan of reorganization, 11 U.S.C. § 1129; classify claims, id. § 1123(a)(1); discharge claims, id. § 523; and provide the means for implementing a reorganization plan, id. § 1123(a)(5). The bankruptcy court may or may not have had subject matter jurisdiction to discharge MacDonald; but even if it did not, the bankruptcy court was competent to confirm a plan of reorganization, and the aggrieved party was free to appeal.
 
 B. Identity of Causes of Action
 
 42
 To determine whether the causes of action are the same, we examine whether the same transaction, evidence, and factual issues are involved in both cases. Sure-Snap, 948 F.2d at 874; NLRB v. United Technologies Corp., 706 F.2d 1254, 1260 (2d Cir.1983). The three elements are satisfied in this case. The Local 814 Claim and the Trustees' cause of action here involve the same transaction: the payment of Santini's withdrawal liability. The same evidence--the actuarial valuations and financial proofs--is necessary for both claims. And there are no differences in the factual issues.
 
 
 43
 The Trustees made two arguments before the district court, which they press again on appeal, to show that the claims were not identical: 1) the withdrawal liability claim cannot be deemed to have been litigated in the bankruptcy court, because it was a non-core proceeding that could not have been litigated there; 2) the Trustees' full claim could not have been brought before the bankruptcy court, because only a portion of the Trustees' claim against MacDonald was ripe at the time of the Santini Plan's confirmation. Neither argument prevails.
 
 1. Non-Core Proceedings
 
 44
 The Trustees argue that the withdrawal liability claim could not have been litigated in bankruptcy court because it was not a "core proceeding" under 28 U.S.C. § 157(b).[5] A bankruptcy judge may hear proceedings that are not core proceedings, but that are "otherwise related to a case under title 11." 28 U.S.C. § 157(c)(1). In that situation, the bankruptcy judge submits proposed findings of fact and conclusions of law to the district court, which then reviews any objections to the proposed findings de novo and enters a final judgment. Id. At least in the first instance, the decision as to whether a claim is "core" is "reserved for the bankruptcy judge to determine." Sure-Snap, 948 F.2d at 873 (claims at issue were barred by res judicata, even if they were not core proceedings) (citing § 157(b)(3)).
 
 
 45
 The bankruptcy court evidently concluded that the withdrawal liability claim was a core claim.[6] (The record does not reflect that the bankruptcy court submitted proposed findings of fact and conclusions of law to the district court, as would have been necessary for resolution of a non-core proceeding by the bankruptcy court. See 28 U.S.C. § 157(c)(1).) The Santini plan expressly resolves the question of MacDonald's liability for the withdrawal liability claim: "the Local 814 Claim will be paid over sixty (60) months in equal monthly installments from the combined excess cash flow of Santini and MacDonald [ ]." Reorg. Plan § 4.8 (emphasis added). This statement, combined with the definition of "Excess Cash Flow" (fifty percent of Santini's cash flow, plus MacDonald's, minus the amounts previously paid to unsecured creditors, Reorg. Plan § 1.39), makes clear that MacDonald was made liable on stated terms and conditions for payment of the Local 814 Claim. Moreover, §§ 14.16 and 13.2 of the Santini Plan operate to release and preclude further claims against MacDonald (as discussed in part I).[7]
 
 
 46
 The bankruptcy court's actual resolution of the claim for withdrawal liability distinguishes this case from cases relied upon by the Trustees, in which the claim presented in the second proceeding had not been adjudicated in the bankruptcy proceeding. See Barnett v. Stern, 909 F.2d 973, 978-82 (7th Cir.1990) (non-core RICO claim not barred by res judicata where it was not asserted in bankruptcy court); Howell Hydrocarbons, Inc. v. Adams, 897 F.2d 183, 188-90 (5th Cir.1990) (same).
 
 2. Ripeness
 
 47
 The Trustees argue that identity of claims is lacking because, at the time of the Santini Plan's confirmation, their full $308,815 claim against MacDonald was not yet ripe. According to the Trustees, only $60,905 of the claim was ripe on the Santini Plan's confirmation date, because under the ERISA statutory scheme, the Trustees could only collect the full amount of withdrawal liability in the event of a default, which occurs 60 days following failure to pay on the due date. In this case, the due date of the first installment was May 1, 1992, so that default occurred on June 30, five days after the confirmation date.
 
 
 48
 We agree with the district court's analysis of this issue:
 
 
 49
 Under p 13.2 of the Plan, "Confirmation shall operate as a discharge, pursuant to Bankruptcy Code Section 1141(d) ... of any and all debts or Claims against the Debtor...." As [MacDonald] points out, claims are broadly defined in the Bankruptcy Code, so that discharge is effective as to claims which are "liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). [8] Thus, the discharge was apparently effective even though no substantive claim pursuant to ERISA could have been brought before confirmation. More importantly, though, the Trustees will not now be heard to complain about a schedule [of] payment to which they did not object and from which they did not appeal. [The Trustees] could have put the full claim before the Bankruptcy Court by filing an amended claim before confirmation. [The Trustees] could also have sought from the Bankruptcy Court a payment schedule which would preserve the ability to seek accelerated damages. The Trustees' failure to protect their interests will not preclude the proper application of res judicata to bar the claim.
 
 Dist. Ct. Op. at 19-20 (Emphasis added).[9]
 
 50
 The Trustees contend that the language of § 13.2 quoted by the district court deals only with the debtor, not with MacDonald. But § 13.2 provides for payment of the withdrawal liability claim by Santini and MacDonald, and discharges all debts and claims "against the Debtor, ... and against any person which/who is an Insider or Affiliate of the Debtor that arose at any time before Confirmation ... whether accrued before, on, or after the Filing Date." Moreover, the release ran in favor of MacDonald as an affiliate, and the Trustees were thereby precluded from raising against MacDonald "any Claim of the type released or deemed released herein." Reorg. Plan § 14.16.
 
 C. Effectiveness of the Reorganization Plan
 
 51
 Among the purposes of res judicata are to "relieve parties of the cost and vexation of multiple lawsuits ... [and] encourag[e] reliance on adjudication." Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). These finality interests are particularly important in the bankruptcy context, where numerous contending claims and interests are gathered, jostle, and are determined and released. The Santini Plan provides that unsecured claims against Santini, as well as the Local 814 Claim, will be paid from "Excess Cash Flow," a term defined to mean fifty percent of "cumulative aggregate Cash Flow of [Santini] and MacDonald [ ]." Reorg. Plan. § 1.39 (emphasis added). MacDonald's contribution to the payment of the Local 814 Claim confers no visible benefit on the Trustees or their ERISA Fund; MacDonald had been statutorily liable to the Trustees for the whole obligation. But MacDonald's participation in the Reorganization Plan was not limited to the Local 814 Claim. MacDonald's Excess Cash Flow as well as Santini's is directed by the Plan to payment of the unsecured creditors' claims as well. See id. § 4.9(B)(iii). Thus MacDonald's contribution did confer a benefit on the unsecured creditors, and MacDonald cannot be extricated from the Plan without impairing the rights of the unsecured creditors. In any event, it cannot be denied that a judgment in favor of the Trustees in this case would "impair, destroy, challenge, or invalidate the enforceability or effectiveness" of the Reorganization Plan at least insofar as that Plan settles the amount, source and payment schedule of the obligation that is the subject of this lawsuit. See Sure-Snap, 948 F.2d at 870 (claims "whose timely bringing may have affected the parameters of a bankruptcy repayment schedule cannot be re-litigated another day in another court").
 
 CONCLUSION
 
 52
 All of the requirements for res judicata were met. We therefore affirm the judgment.
 
 
 
 [1]
 On June 28, 1993, the action as to MacDonald Moving & Storage, Inc. was dismissed without prejudice. On June 26, 1994, a default judgment was entered against Pasquale Santini
 
 
 [2]
 "Excess Cash Flow" is defined in the Plan as fifty percent of "cumulative aggregate Cash Flow of the Debtor and MacDonald[ ], less cumulative aggregate amounts previously paid to Unsecured Creditors." Reorg. Plan § 1.39. "Cash Flow" is defined as net income before taxes plus, inter alia, depreciation and proceeds from sale of real property. Id. § 1.16
 
 
 [3]
 The Trustees argue that Chicot County has been limited by United States v. U.S. Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940), so that it applies only to situations in which a statute has subsequently been declared unconstitutional. While it is true that U.S. Fidelity narrowed Chicot County, it did so by stating that "Chicot County ... is inapplicable where the issue is the waiver of immunity." Id., 309 U.S. at 514, 60 S.Ct. at 657
 
 
 [4]
 The Trustees had notice of the Chapter 11 proceeding; they filed a timely Proof of Claim; and when the Trustees demanded in February 1992 that MacDonald and Santini pay their withdrawal liability, Santini's bankruptcy counsel promptly responded that the Santini Plan "concentrates on both the Santini and MacDonald operations and is relying on the excess cash flow produced by both businesses to fund the Plan." The Trustees did not appeal the order confirming the Santini Plan (which discharged and released claims against MacDonald); nor did they submit their Amended Proof of Claim (which was based on a July 1991 actuarial valuation) until March 12, 1993--17 months after the bar date and 20 months after the valuation was performed
 
 
 [5]
 § 157(b) provides in relevant part that
 (1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11....
 (2) Core proceedings include, but are not limited to--
 (A) matters concerning the administration of the estate;
 (I) determinations as to the dischargeability of particular debts;
 (J) objections as to discharges;
 (L) confirmations of plans;
 (3) The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11....
 
 
 [6]
 We express no view as to whether this determination by the bankruptcy court was proper, but we note that one of the categories of core proceedings is "determinations as to the dischargeability of particular debts." 28 U.S.C. § 157(b)(2)(I). See also In re Johns-Manville Corp., 801 F.2d 60, 64 (2d Cir.1986) (actions that will likely affect the administration of the estate fall within the bankruptcy court's core jurisdiction)
 
 
 [7]
 Moreover, Santini's lawyers told the Trustees that the plan relied on Santini and MacDonald to fund it
 
 
 [8]
 The definition of a "Claim" in § 1.19(A) of the Santini Plan tracks the language of 11 U.S.C. § 101(5)
 
 
 [9]
 The Supreme Court has recently granted a writ of certiorari to consider the question of when a cause of action accrues in the withdrawal liability setting. The Ninth Circuit case from which certiorari was granted, Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California, 73 F.3d 971 (9th Cir.1996), cert. granted, --- U.S. ----, 117 S.Ct. 1690, 137 L.Ed.2d 817 (1997), held that liability accrued on the date the employer withdrew from the fund, rather than on the date the employer missed its first payment or the date of default