(February 15, 2007)

■ INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, Respondent, v HSBC BANK USA, Appellant. [829 NYS2d 511]—

Order, Supreme Court, New York County (Charles Edward Ramos, J.), entered March 23, 2005, which, inter alia, granted plaintiff's motion for summary judgment as to liability, and denied defendant's motion for summary judgment dismissing the complaint, modified, on the law, that aspect of defendant's motion which sought summary judgment dismissing the fifth cause of action granted, that cause of action dismissed, and otherwise affirmed, without costs.

Nonparty Herkimer Wholesale Company Inc. (Herkimer) was a licensed cigarette wholesaler and tax agent. Plaintiff, Insurance Company of the State of Pennsylvania (ICSP), had issued a bond to guarantee the payment by Herkimer to the State of New York of tax receipts in Herkimer's possession. Due to Herkimer's insolvency, the State brought an action against ICSP for payment on the bond (*see State of New York v Insurance Co. of State of Pa.*, 305 AD2d 916 [2003], *lv denied* 1 NY3d 502 [2003]) in December 2000. ICSP filed a third-party complaint in that action against defendant HSBC Bank USA.[1] There, ICSP asserted the identical claim against the Bank that it makes in this action, that the Bank misappropriated state tax funds. The

---

**1.** Marine Midland Bank is the bank which was initially involved in this litigation, and the predecessor in interest to defendant HSBC. The two entities will be referred to as "the Bank" for ease of reference.

Third Department dismissed the third-party complaint. It concluded that ICSP's claims against the Bank were premature (*id.* at 918). That Court held that ICSP did not have subrogation rights until it had paid the State's claim on the bond. In December 2003, ICSP made that payment. In this action, ICSP seeks to recover the State's tax revenue from the Bank. These are the sums that were paid pursuant to the bond.

Earlier, in the fall of 1997, Herkimer had experienced financial difficulties, and it defaulted on a loan with the Bank. Herkimer's creditors filed an involuntary liquidation proceeding against it, pursuant to chapter 7 of the United States Bankruptcy Code. At this point 11 USC § 362 (a) effected an automatic stay precluding any creditor from bringing an action for sums allegedly due from Herkimer. The Bank then moved for an order directing Herkimer to deposit all monies collected subsequent to November 5, 1997 into an account at the Bank. The parties herein refer to that account as the "cash collateral account." Pursuant to an agreement with Herkimer, executed before the bankruptcy proceedings, the Bank had a first perfected priority blanket security interest in all accounts and other property belonging to Herkimer.

In December 1997, the bankruptcy court approved Herkimer's motion pursuant to 11 USC § 706 (a) to convert the chapter 7 proceeding into a chapter 11 reorganization. After holding a hearing, the bankruptcy court approved a stipulation allowing Herkimer to continue operating its business, subject to the oversight of the Bank and the continuing jurisdiction of the bankruptcy court. The court's order allowed the wholesaler to run its business with the funds it had on account at the Bank. These funds were segregated into a new "debtor-in-possession" account. All of Herkimer's profits were to be deposited with the Bank. Neither the State nor ICSP was present at the hearing, nor were they parties to the stipulation, which was formally approved on December 17, 1997.

When Herkimer's involuntary chapter 7 liquidation was converted into a chapter 11 reorganization, no new bankruptcy petition was filed. The conversion stipulation, which was read into the record, stated that the 11 USC § 362 (a) stay remained in effect. That stay: "protect[ed] [the debtor] against 'the pursuit of actions by *any* party' . . . [and] 'all entities.' Basically, entity means anyone . . . . Thus, even the United States, the states, and their subdivisions are bound by the stay. Their sovereign immunity sometimes protects them, but only against damages for having violated the stay. . . . [G]overnment action that violates the stay is as legally ineffective as any private

person's violation." (Epstein, Nickels & White, Bankruptcy § 3-3, at 65 [1993] [citation omitted]). On December 11, 1997 Herkimer wrote to the State Department of Taxation and Finance (DTF), asking whether the Bank could obtain a security interest in cigarettes and cigarette tax stamps in its possession. DTF responded *to the Bank's counsel*. Its December 19, 1997 letter stated: "Licensed agents such as [Herkimer] are, by law, agents of the State for the administration of tax imposed by Article 20 of the Tax Law. Such agents are fiduciaries and must account to the State for any unused or unpaid for stamps. Cigarette tax stamps are only and essentially tangible evidence of the payment of the cigarette tax, and cannot be pledged by an agent. *Accordingly, [the Bank] can never acquire a secured interest in cigarette tax stamps whether affixed to cigarettes or not. No private individual can obtain a lien on a sovereign State's taxing powers*" (emphasis supplied and citations omitted). On December 19, 1997, the State filed a claim against Herkimer in bankruptcy court for $2,019,370.50 in taxes, plus penalties and interest. The State claimed priority for "a debt due a sovereign State," not to funds held "in trust" pursuant to 11 USC § 541 (d). ICSP also filed a claim in the bankruptcy proceeding based upon its potential liability on the Herkimer bond. These acts alerted the bankruptcy court, Herkimer, and the Bank that specified traceable prepetition state tax proceeds were within the bankrupt's accounts at the Bank.

On February 24, 1998, the bankruptcy court determined that Herkimer was unable to comply with the reorganization plans. It thus lifted the 11 USC § 362 (a) restrictions, allowing, for the first time, the Bank to foreclose on the money and property securing Herkimer's loan. The next day, February 25, 1998, the Bank seized all of the money in the "debtor-in-possession" account and all of Herkimer's inventory. No attempt to satisfy the State's claim for over $2 million dollars in unpaid cigarette taxes was made.

On February 19, 2004,[2] plaintiff brought this action against the Bank. The amended complaint alleges claims for money had and received, unjust enrichment, constructive trust, accounting and common-law indemnity. Plaintiff moved for summary judgment. It asked that the defendant be ordered to give an accounting of the extent to which it had misappropriated state property when seizing Herkimer's assets. It also sought the $2,019,370.50 claimed due the State in the bankruptcy proceeding, plus interest. In opposition, defendant asserted that plaintiff's claims were time-barred. It also claimed that

2. An amended complaint was filed on March 16, 2004.

plaintiff's present claims were precluded by res judicata, based upon the bankruptcy court order. The IAS court granted plaintiff's motion as to liability, and ordered the Bank to provide an accounting with respect to the factual issues regarding damages.

The Bank's first contention is that the causes of action for money had and received, unjust enrichment, constructive trust, and an accounting are all time-barred. It is uncontested each of these claims is subject to a six-year statute of limitations (CPLR 213 [1]; *see Gonzalez v Anchor Bank Corp.*, 245 AD2d 132 [1997] [money had and received]; *Natimir Rest. Supply v London 62 Co.*, 140 AD2d 261, 262 [1988] [unjust enrichment]; *Matter of Sakow*, 219 AD2d 479, 482 [1995] [constructive trust]; *Matter of Barabash*, 31 NY2d 76, 80 [1972] [accounting]).

As a general rule, a cause of action accrues when all of the facts necessary to sustain the claim have occurred, so that a party can obtain relief in court (*Matter of Motor Veh. Acc. Indem. Corp. v Aetna Cas. & Sur. Co.*, 89 NY2d 214, 221 [1996], citing *Aetna Life & Cas. Co. v Nelson*, 67 NY2d 169, 175 [1986]; *Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.*, 87 NY2d 36, 43 [1995]). An action brought by a subrogee is subject to the same statute of limitations applicable to the claims of the subrogor, here the State (*see Allstate Ins. Co. v Stein*, 1 NY3d 416, 420-421 [2004]).

The Bank argues that plaintiff's claims accrued in December 1997, when the bankruptcy court allowed the Bank to monitor Herkimer's accounts. However, the December 1997 order did not give the Bank any rights to the sovereign property on deposit with it, and subject to the continuing jurisdiction of the bankruptcy stay (11 USC § 362 [a]). The Bank moved money from two accounts at the bank, both subject to the bankruptcy stay, i.e. from "cash collateral account" into the "debtor-in-possession account," and allowed it, as is customary in a reorganization case, to be used by Herkimer only in the ordinary course of business. All of Herkimer's property was subject to the bankruptcy stay, and the wholesaler was required to deposit proceeds from its business within 24 hours of receipt. Neither the Bank, the State, nor any other entity had rights to funds in Herkimer's accounts at the Bank until the bankruptcy stay was lifted.

The tax revenue and property sought by ICSP in this litigation was never collateral available to secure Herkimer's indebtedness to the Bank. It is tax revenue which was, at all times, held in trust for the State (*see* Tax Law § 1132 [a] [1]; 20 NYCRR 532.2; *see also* 20 NYCRR 564.1 [a]). The record is also

clear that the Bank was on notice of this fact. As explained in the State DTF's letter to the Bank's counsel, "[n]o private individual can obtain a lien on a sovereign State's taxing powers." Plaintiff's claims accrued on February 25, 1998, after the bankruptcy stay was lifted and the Bank foreclosed on all of Herkimer's accounts, without paying the State its tax proceeds. The Bank's act was a violation of the State's rights. ICSP, as subrogee of the State, filed this complaint on February 19, 2004, within six years of the Bank's foreclosure of the wholesaler's accounts. Thus, the contested claims are timely.

Plaintiff's first cause of action, for money had and received, requires a showing that: (1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of the money; and (3) under principles of good conscience defendant should not be allowed to retain that money (*Board of Educ. of Cold Spring Harbor Cent. School Dist. v Rettaliata*, 78 NY2d 128, 138 [1991]; *Parsa v State of New York*, 64 NY2d 143, 148 [1984]; *Schreibman v Chase Manhattan Bank*, 15 AD2d 769, 770-771 [1962]). Clearly, ICSP's claim for money had and received could not have accrued any earlier than February 25, 1998. Before that date, the Bank did not have unrestricted access to the sovereign property, the power to take it, or a "good conscience basis" to return it. Once the Bank foreclosed on the debtor's account, knowing that the seized property included tax proceeds, the elements of this cause of action were established (*see Gonzalez*, 245 AD2d at 132, *supra*).

The second cause of action, for unjust enrichment, requires a showing that it would be contrary to equity and good conscience to permit defendant to retain what is sought to be recovered (*Paramount Film Distrib. Corp. v State of New York*, 30 NY2d 415, 421 [1972]). As with the claim for money had and received, the lifting of the bankruptcy stay and the Bank's wrongful inclusion of the tax proceeds in its subsequent foreclosure caused it to be "unjustly enriched." Accordingly, this claim also accrued on February 25, 1998, and it was timely asserted.

The third cause of action asserts that the State's property was subject to constructive trust and the fourth calls for an accounting. The elements of a claim for a constructive trust are "a confidential or fiduciary relationship, a promise, a transfer in reliance upon the promise, and unjust enrichment" (*Lipton v Donnenfeld*, 5 AD3d 356, 357 [2004], *lv denied* 2 NY3d 707 [2004]; *Sharper v Harlem Teams for Self-Help*, 257 AD2d 329, 332 [1999]). Again, it was not until the bankruptcy stay was lifted that the Bank was unjustly enriched. On that date it breached its fiduciary duty to the State when it invaded ac-

counts consisting of sovereign property to attempt to satisfy the wholesaler's debt. The first "wrongful act giving rise to the duty of restitution," was the foreclosure which occurred on February 25, 1998, and this is the date of accrual of the claim for imposition of a constructive trust (*see Matter of Sakow, supra*). Because the Bank's acts constituted a repudiation of its obligation to the State, it is also the date of accrual for the claim for an accounting (*see Barabash*, 31 NY2d at 80, *supra*).

The dissent takes issue with the fact that the State and ICSP took no actions to "vindicate the State's right[s]" during the bankruptcy proceedings. However, throughout the period of Herkimer's bankruptcy, no one even questioned the State's right to the sales tax funds on account with the Bank. Thus, neither the State nor ICSP was required to bring a claim for the tax revenue before the bankruptcy court. The funds were itemized in the record, including calculated interest and penalties. The tax proceeds from cigarette sales which took place before Herkimer was declared bankrupt (prepetition assets), were traceable and were *never removed* from defendant's accounts throughout the pendency of the bankruptcy proceeding. In addition, during the time that Herkimer attempted a chapter 11 reorganization, it needed additional tax stamps. These were provided, subject to the oversight of the bankruptcy court so that Herkimer could conduct its sale of cigarettes.

There is also no merit to the contention that plaintiff's claims are barred under the doctrine of res judicata. Claim preclusion generally prohibits relitigation of any cause of action which was or could have been raised in a prior action where: (1) there is a final judgment on the merits in the prior action; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases (*In re Atlanta Retail, Inc.*, 456 F3d 1277, 1284-1285 [11th Cir 2006]).

Under general principles of claim preclusion, this action would not be barred. However, res judicata is even less likely to be applied in the context of a bankruptcy proceeding than in ordinary civil litigation (*see In re Philip Servs. [Del.], Inc.*, 267 BR 62, 67-68 [D Del 2001]). Thus, claims not specifically raised before a bankruptcy court are less likely to be deemed precluded in later litigation (*id.*). This is because of both the large number of persons who can be directly or incidentally affected by a bankruptcy proceeding and the far reaching impact of a bankruptcy court's orders (*id.*). Accordingly, this action is not precluded by Herkimer's bankruptcy. As explained by the Third Circuit: "a claim should not be barred [under a theory of res judicata] un-

less the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them at the same time in the bankruptcy forum." (*Eastern Mins. & Chems. Co. v Mahan,* 225 F3d 330, 337-338 [3d Cir 2000].)

Cases cited by the dissent for the proposition that the foreclosure order in the bankruptcy proceeding precludes this action are factually distinguishable and inapposite. For example, in *York Holdings v Shafran* (278 AD2d 77 [2000]), this Court reviewed an appeal from an order of the IAS court which denied defendant's motion to vacate a judgment of foreclosure and sale. We dismissed the appeal as moot. In *York,* subsequent to the order appealed, the subject property was "sold at auction and that sale was *confirmed in an Order of Confirmation issued by the Bankruptcy Court"* (*id.* [emphasis supplied]). The defendant did not move to have the order of the bankruptcy court set aside, nor did it take an appeal from the bankruptcy court order (*id.*). The facts here are not similar to those in *York Holdings,* as all of the challenged acts took place after the bankruptcy stay was lifted. As stated, the claims accrued after the stay was lifted and the Bank took the State's tax proceeds. There was no motion practice or order in bankruptcy court which precluded ICSP's claims as there was in *York Holdings.*

Another example of an inapplicable authority cited by the dissent is *Regions Bank v J.R. Oil Co., LLC* (387 F3d 721 [8th Cir 2004]). There, the plaintiff sought to challenge a sale which occurred in the course of the bankruptcy proceeding, subject to the oversight of the bankruptcy court (*id.* at 731). The Eighth Circuit affirmed an order of the Eastern District of Arkansas, which found that the plaintiff's subsequent challenge to such sale was precluded as an impermissible attack on the final judgment of that tribunal (*id.*).

Again, here, unlike *Regions Bank,* the challenged acts occurred after the bankruptcy stay was lifted and there was no motion practice before the bankruptcy court to support a claim of preclusion. In fact, there was minimal activity before the bankruptcy court in this case. An involuntary chapter 7 proceeding was commenced, effecting a stay. The case was converted to a chapter 11 reorganization, and when the reorganization proved unsuccessful, the case was converted back to a chapter 7 liquidation. Neither the cash collateral order nor the order lifting the stay and permitting defendant to "foreclose on all of the collateral securing [the wholesaler's] indebtedness to [defendant]" addressed or determined the State's claims to proceeds

from sale of the tax stamps. These were monies the Bank obtained after the bankruptcy stay was lifted and subsequently seized the wholesaler's property. The Bank was on notice, based upon the letter it received from the State Department of Taxation and Finance, that it could not apply the tax proceeds it held to satisfy Herkimer's debt. Notably, ICSP is not asserting claims as a creditor of Herkimer. Its claims arise as subrogee of the State of New York for the misappropriation of tax revenue.

We disagree with the dissent's statement that "the necessity for the State or its subrogee to take steps in the bankruptcy court to reclaim the tax proceeds was obvious." While the State had a right to pursue a claim for prepetition tax proceeds before the bankruptcy court (*see City of Farrell v Sharon Steel Corp.*, 41 F3d 92 [3d Cir 1994]), neither the Bankruptcy Code nor the case law interpreting it required the State to bring an action in that forum.[3] For this reason, it does not matter whether the dissent is correct in inferring that the State's actions may have been motivated by its knowledge that its losses would be indemnified by ICSP. Suffice it to say, however, an equally plausible inference is that the State proceeded as it did so as not to interfere with Herkimer's attempt to salvage its business. Had Herkimer been successfully rehabilitated, it would have been a source of additional tax revenue for the State.

In any event, there was no judgment on the merits of the State's claims to its prepetition tax proceeds before the bankruptcy court, and plaintiff is not precluded from prosecuting them in this action (*see Atlanta Retail, supra*; *In re Philip Servs. [Del.], Inc.*, 267 BR at 67-70, *supra*).[4]

Supreme Court erred, however, in denying that aspect of defendant's motion which sought summary judgment dismissing plaintiff's fifth cause of action for common-law indemnification. A cause of action for common-law indemnification can be sustained only if: (1) the party seeking indemnity and the party from whom indemnity is sought have breached a duty to a third

---

**3.** It would have been necessary for the State to take such steps only if its failure to do so would preclude the State from bringing an action against the Bank in the event the Bank, although certainly not required to do so by the foreclosure order, seized the State's property along with money and property belonging to Herkimer. The dissent, however, cites no decision supporting the proposition that the State should have anticipated such action by the Bank and is so precluded as a result of its failure to do so. For this reason, the dissent is not persuasive in asserting that the necessity of the State to have taken such steps was "obvious."

**4.** We agree with the dissent that the Third Department's discussion of claim preclusion in *State of New York v Insurance Co. of State of Pa.* (305 AD2d 916, 918 [2003]), is nonbinding dicta.

person, and (2) some duty to indemnify exists between them (*Rosado v Proctor & Schwartz*, 66 NY2d 21, 24 [1985]). There is no duty here, as between ICSP and the Bank, to prevent injury to the State. Thus, there can be no right of indemnity by one from the other (*Smith v Hooker Chem. & Plastics Corp.*, 83 AD2d 199, 202 [1981], *appeal dismissed* 56 NY2d 645 [1982]; *see City of New York v Lead Indus. Assn.*, 222 AD2d 119, 125 [1996]).

The Bank took state tax revenue which resulted in plaintiff's liability under the bond. However, the Bank's acts do not give rise to a cause of action for common-law indemnification in plaintiff's favor. The Bank did not breach any independent obligation to ICSP. Because the Bank and ICSP did not have a common duty to prevent injury to the State, plaintiff's cause of action for common-law indemnification fails as a matter of law.

We have reviewed defendant's remaining arguments and find them unavailing. Concur—Tom, J.P., Mazzarelli and McGuire, JJ.

Friedman, J., dissents in part in a memorandum as follows: This action, which was commenced in February 2004, is based on actions defendant bank took between December 1997 and February 1998 in relation to the disposition of cash collateral in the bankruptcy case of a cigarette wholesaler. It is plaintiff's contention that defendant bank interfered with the right of plaintiff's subrogor, the State of New York, to the cigarette and sales tax proceeds that were commingled with the wholesaler's own cash funds. As explained below, I believe that plaintiff's claim is precluded by res judicata, based on a February 1998 order issued in the bankruptcy case—to which the State was a party—that (whether rightly or wrongly) expressly permitted defendant to foreclose on the cash collateral account in which the tax proceeds were deposited. Accordingly, I respectfully dissent from the majority's disposition to the extent it affirms the denial of defendant's motion for summary judgment dismissing plaintiff's first, second, third and fourth causes of action. On this record, the complaint should have been dismissed in its entirety.[1]

The instant dispute arises from the bankruptcy of Herkimer

---

1. Given my view that this action is barred by principles of res judicata, I find it unnecessary to address either defendant's argument that the action is time-barred or the majority's rejection of that argument. Nonetheless (and notwithstanding plaintiff's failure to raise this point), I note that defendant's statute-of-limitations argument appears to be rendered untenable by CPLR 204 (a), which has been held by this Court to toll the statute of limitations so long as the automatic stay for bankruptcy is in effect (*see Zuckerman v 234-6 W. 22 St. Corp.*, 267 AD2d 130 [1999], *lv denied* 94 NY2d 764 [2000]; *see also*

Wholesale Company, Inc. (Herkimer), which was a Utica-based wholesale dealer of cigarettes, food and beverages. As a licensed cigarette dealer, Herkimer purchased cigarette tax stamps from the State on credit (30-day terms), affixed the stamps to cigarette containers sold to retailers, and received from the retailers prepayments of the applicable cigarette and sales taxes. Although I assume that, as plaintiff argues, the prepaid tax proceeds in Herkimer's possession were, as a matter of New York law, held in trust for the State (*see Lincoln First Commercial Corp. v New York State Tax Commn.*, 136 Misc 2d 478 [1987]), Herkimer commingled the tax proceeds with its own cash. As required by statute, Herkimer procured from plaintiff herein, Insurance Company of the State of Pennsylvania (ICSP), a bond in the amount $2.2 million securing the performance of Herkimer's obligation to timely pay such tax proceeds over to the State.

In October 1996, Herkimer entered into a loan and security agreement (hereinafter, the finance agreement) with Marine Midland Bank, the predecessor-in-interest of defendant HSBC Bank USA (hereinafter the Bank). The finance agreement was a revolving credit facility that granted the Bank a security interest in essentially all of Herkimer's property, "whether now or hereafter acquired," including all proceeds of Herkimer's inventory and "all of [Herkimer's] deposit accounts, credits, and balances with [the Bank] existing at any time." The finance agreement did not exclude the tax proceeds in Herkimer's possession from the scope of the Bank's security interest.

On November 6, 1997, the Bank declared Herkimer in default of the finance agreement. At that time, Herkimer's debt to the Bank was approximately $11 million. Four days later, on November 10, certain of Herkimer's unsecured creditors commenced an involuntary chapter 7 (liquidation) bankruptcy proceeding against Herkimer in the United States Bankruptcy Court for the Northern District of New York. The commence-

*Mercury Capital Corp. v Shepherds Beach*, 281 AD2d 604, 605 [2001]; *Zuckerman v 234-6 W. 22 St. Corp.*, 167 Misc 2d 198, 202-203 [1996]; Siegel, NY Prac § 51, at 72 [4th ed]). In view of CPLR 204 (a), this action (which was commenced on February 19, 2004) apparently would be timely under the six-year statute of limitations even if, as defendant argues, plaintiff's claims accrued in December 1997. This is because the automatic stay for bankruptcy applicable to the claims at issue went into effect on November 10, 1997 (the date the cigarette wholesaler's bankruptcy case was commenced) and remained in effect until February 24, 1998, when the bankruptcy court issued an order lifting the automatic stay and permitting defendant bank to foreclose its lien on the subject funds. This being the case, the majority's extended discussion of when the claims should be deemed to have accrued (which includes many statements with which I disagree) seems to be beside the point.

ment of the bankruptcy proceeding triggered the statutory automatic stay of all litigation of prepetition claims against Herkimer and all acts seeking to obtain property held by Herkimer's bankruptcy estate (*see* 11 USC § 362).

On November 12, the Bank obtained from the bankruptcy court a temporary restraining order barring any disposition of the collateral securing Herkimer's indebtedness except in the ordinary course of business, and requiring that all cash proceeds of Herkimer's business since November 7, 1997, be deposited into a checking account to be established at the Bank. Such an account (the cash collateral account) was subsequently established. Thereafter, by order dated November 26, 1997, the bankruptcy court granted Herkimer's motion to convert the case to a chapter 11 reorganization. As required by the Federal Rules of Bankruptcy Procedure, Herkimer filed a list of its 20 largest unsecured creditors, which list identified the State as Herkimer's largest unsecured creditor. Having been identified as a creditor of Herkimer, the State was a party to the bankruptcy proceeding for purposes of being bound by orders rendered therein (*see Sanders Confectionery Prods., Inc. v Heller Fin., Inc.*, 973 F2d 474, 480-481 [6th Cir 1992], *cert denied* 506 US 1079 [1993]; *see also* 11 USC § 1109 [b] ["A party in interest, including . . . a creditor . . . , may raise and may appear and be heard on any issue" in a chapter 11 case]).[2]

At a hearing held before the bankruptcy court on December 10, 1997, Herkimer, the Bank, and certain of Herkimer's unsecured creditors entered into a stipulation on the record concerning Herkimer's operation of its business as a debtor-in-possession in the chapter 11 proceedings (the Stipulation).[3] The Stipulation (which the bankruptcy court formally approved by order dated December 17, 1997, subsequently amended by order dated January 2, 1998) provided that the cash collateral account would be "held under the joint control of the [B]ank and [Herkimer], subject to the lien of the [B]ank," although Herkimer agreed that it would "not attempt to draw any checks or initiate any wire transfers from the cash collateral account" and "authorize[d] the [B]ank to place a hold on the cash collat-

---

**2.** Significantly, ICSP does not raise any issue concerning the State's receipt of due notice of any proceeding in the bankruptcy case relevant to the issues on this appeal.

**3.** While the majority notes that "[n]either the State nor ICSP was present" at the December 10, 1997 bankruptcy court hearing where the Stipulation was placed on the record, the record establishes, as more fully discussed below, that both the State and ICSP were well aware of Herkimer's bankruptcy at the time. Both the State and ICSP, each for its own reasons, chose not to be present at the hearing.

eral account to ensure the prevention of same." The Stipulation further provided that the Bank would transfer funds, according to a specified schedule, from the cash collateral account to a separate debtor-in-possession account, from which Herkimer would draw funds to be used solely in the ordinary course of its business. In addition, the Stipulation provided that the amount of cash deposited in the cash collateral account, in which the Bank was recognized to have a "continuing first priority security interest" under the finance agreement, would be used to calculate the amount of money available to Herkimer to "reborrow" from the Bank.

Herkimer operated its business as a debtor-in-possession for about three months, but failed to stay in compliance with the terms of the Stipulation. Accordingly, the bankruptcy court issued an order, dated February 24, 1998, that lifted the automatic stay in accordance with the terms of the Stipulation and directed that the Bank was "free to enforce the terms of the Stipulation in its entirety and foreclose on all of the collateral securing [Herkimer's] indebtedness to [the Bank]." On February 25, 1998, the Bank, in accordance with the terms of the foreclosure order, applied the $4.3 million balance in the cash collateral account to reduce Herkimer's debt to the Bank. The following month, Herkimer's bankruptcy proceeding was converted back to a chapter 7 case. It is undisputed that, after Herkimer's assets were liquidated, the Bank was left with an unsatisfied deficiency exceeding $3 million.

The foregoing events did not transpire unbeknownst to the State or ICSP. Herkimer's principal testified that he advised the State of the bankruptcy case within a week of its filing, and, on or about December 19, 1997, the State filed a proof of claim in the amount of $2,265,852.96 in Herkimer's bankruptcy case.[4] ICSP has admitted that it became aware that Herkimer was in bankruptcy no later than November 14, 1997, the date its representative sent the State a letter requesting that the State cease selling Herkimer tax stamps, and giving notice that ICSP was canceling Herkimer's bond in accordance with its terms. ICSP has also admitted that it retained counsel in Utica to monitor developments in Herkimer's bankruptcy case. Moreover, after the State, by letter to ICSP dated January 6, 1998, demanded payment of the full amount of Herkimer's bond, ICSP

---

4. The amount of the State's claim against Herkimer's estate comprised $2,019,370.50 owed for cigarette and sales tax stamps purchased in October and November of 1997, $246,389.59 in interest and penalties that accrued after Herkimer failed to make timely payment for such stamps, and $92.87 for a penalty and interest relating to the highway use tax.

filed a contingent proof of claim in the Herkimer bankruptcy case, although, as later discussed, it refused to honor the State's demand for almost six years. Notwithstanding that both the State and ICSP were thus fully aware of the bankruptcy case, and had submitted themselves to the jurisdiction of the bankruptcy court by filing proofs of claim with that tribunal, neither took any further action in those proceedings to vindicate the State's right to the tax proceeds in the possession of Herkimer and the Bank.

ICSP persisted in its refusal to honor the State's demand for payment on Herkimer's bond until December 2003. Only then, after the Court of Appeals declined to hear ICSP's appeal from the Third Department's decision affirming a judgment of the Supreme Court, Albany County, awarding the State payment on the bond (*see State of New York v Insurance Co. of State of Pa.*, 305 AD2d 916 [2003], *lv denied* 1 NY3d 502 [2003]), did ICSP finally make the payment the State had demanded in January 1998. By the time the judgment on the bond was paid, the amount ICSP owed the State had grown, due to the accumulation of interest, from $2.2 million (the face amount of the bond) to more than $3.5 million. After finally making payment on the bond, ICSP commenced this action against the Bank on February 19, 2004.[5] In its complaint, ICSP, as subrogee of the State, asserts the State's claim for recovery of the proceeds of tax stamps not paid for by Herkimer, which claim is variously denominated as a cause of action for money had and received, for unjust enrichment, for imposition of a constructive trust, and for an accounting.[6]

This action is barred by principles of res judicata, based on the foreclosure order the bankruptcy court rendered on February 24, 1998. As applied by the federal courts, the doctrine of res judicata bars a subsequent action if "1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction,

**5.** Earlier, in the State's action to recover on the bond, ICSP brought a third-party action against the Bank on the same claims at issue herein. The Third Department affirmed the dismissal of ICSP's third-party claim in that action on the ground that ICSP had not become subrogated to any claim against the Bank as of that time, since it had not yet made payment on the bond (*see State of New York v Insurance Co. of State of Pa.*, 305 AD2d at 919). Because the Third Department dismissed ICSP's third-party action against the Bank as premature, its discussion of the res judicata issue (*id.* at 918) is nonbinding dicta, as the majority correctly recognizes.

**6.** ICSP also asserts, in its own right and not as the State's subrogee, a purported fifth cause of action for "Common Law Indemnity." I concur with the majority to the extent it dismisses the fifth cause of action, which is without merit as a matter of law.

and 4) the causes of action were the same" (*Corbett v Mac-Donald Moving Servs., Inc.*, 124 F3d 82, 88 [2d Cir 1997]).[7] Here, as to the first element (finality) of res judicata, ICSP makes no argument that the foreclosure order was not final and appealable as to the disposition of the property it affected. Indeed, no such argument would be tenable, since it is well established that a bankruptcy court order lifting the automatic stay (as the foreclosure order necessarily did to permit the Bank to foreclose on the cash collateral) is deemed final for purposes of appeal (*see In re Sonnax Indus., Inc.*, 907 F2d 1280, 1283 [2d Cir 1990]; 1 Collier, Bankruptcy ¶ 5.08 [1] [15th ed rev]; 3 Collier, Bankruptcy ¶ 362.12 [15th ed rev]; 6 Norton, Bankruptcy Law & Practice 2d § 148.25; *see also Colon v Option One Mtge. Corp.*, 319 F3d 912, 916 n 1 [7th Cir 2003] [bankruptcy court order granting relief from stay to permit foreclosure was final]; *In re Bonner Mall Partnership*, 2 F3d 899, 903 [9th Cir 1993] [same]).[8] With regard to the second element (identity of parties), there is no dispute that the State (ICSP's subrogor) and the Bank, as creditors of Herkimer, were both parties to the Herkimer bankruptcy case at the time of the foreclosure order (*see Sanders Confectionery Prods., Inc.*, 973 F2d at 480-481; 11 USC § 1109 [b]). Neither is there any dispute, with regard to the third element (jurisdiction of the prior court), that the bankruptcy court had jurisdiction to issue the foreclosure order. ICSP does argue, however, that the fourth element of res judicata (identity of the causes of action) is not satisfied here. This argument has no merit.

The State's claim in the bankruptcy case was to recover the proceeds of the tax stamps for which Herkimer had not paid, along with applicable interest and penalties. As ICSP itself recognizes, this was essentially an in rem claim to the tax proceeds themselves, not a personal claim against Herkimer.[9] This is precisely the same claim that ICSP is asserting in this action,

7. Since the preclusive effect of a prior adjudication is determined by the law of the jurisdiction that rendered it (*see Ionescu v Brancoveanu*, 246 AD2d 414, 416-417 [1998]), we look to federal law to determine the res judicata effect of the foreclosure order, which was rendered by a tribunal within the federal court system.

8. Rather than address the finality of the foreclosure order, ICSP argues the orders approving the Stipulation were not final. Contrary to ICSP's assertion, the Bank's res judicata argument is based on the foreclosure order, not only on the earlier orders approving the Stipulation. Since the foreclosure order alone is sufficient to preclude this action, we need not consider whether the earlier orders approving the Stipulation, by themselves, would have such preclusive effect.

9. Thus, ICSP states on page 27 of its brief: "Notably, the State was not a creditor of Herkimer. It did not seek to collect taxes that had been imposed

regardless of the various labels ICSP chooses to apply. The premise of ICSP's present complaint, like the premise of the State's claim in the bankruptcy court, is that the tax proceeds were trust funds held for the State's benefit when they were deposited in Herkimer's cash collateral account, and that such monies retained their status as trust funds when the Bank took control of them (pursuant to the Stipulation) and ultimately appropriated them to itself pursuant to the foreclosure order.

To avoid the clear identity between the State's claim in the bankruptcy case and the claim asserted in this action, ICSP argues that the foreclosure order did not affect the tax proceeds in the cash collateral account because it permitted the Bank to foreclose only on "the collateral securing [Herkimer's] indebtedness to [the Bank]." It is undisputed that, as a matter of law, such "collateral" did not properly include "sovereign property" of the State of New York, such as the proceeds of unpaid-for tax stamps. Thus, ICSP, engaging in what seems to me linguistic gamesmanship, argues that the tax proceeds, being neither Herkimer's property nor subject to the Bank's security interest, were not at issue in the proceedings leading up to the foreclosure order, and were not addressed by that order. ICSP's conclusion from these premises, with which the majority agrees, is that ICSP remains free to bring this action to recover the tax proceeds, since the issues relating to the tax proceeds were never specifically addressed by the bankruptcy court. I disagree.

It is true that funds a debtor "holds in trust for another" are not "property of the [bankruptcy] estate" under 11 USC § 541 (d) "[b]ecause the debtor does not own an equitable interest in [such] property" (*Begier v IRS*, 496 US 53, 59 [1990] [holding that monies debtor had withheld from employees' wages, or had collected as excise taxes, were held in trust under federal tax law before being paid to the IRS, whether or not actually segregated from debtor's other funds]; *see also* 5 Collier, Bankruptcy ¶¶ 541.11, 541.26; 2 Norton, Bankruptcy Law & Practice 2d § 42:13; 3 Norton, Bankruptcy Law & Practice 2d §§ 51:1, 51:7, 51:17; Resnick, Bankruptcy Law Manual § 5:3, at 365-366 n 23

upon Herkimer, but rather to recover taxes that had been imposed upon others and collected by Herkimer as its agent." While ICSP correctly contends that the State's claim against the Herkimer estate was of an in rem nature (i.e., seeking recovery of a specific res rather than satisfaction of a cause of action against Herkimer personally), I see no basis for ICSP's apparent view that the in rem nature of the State's claim excluded the State from the category of "creditor" under the Bankruptcy Code (*see* 11 USC § 101 [10] [A] [defining "creditor," in pertinent part, as an "entity that has a (prepetition) claim against the debtor"]; 11 USC § 101 [5] [A] [defining "claim," in pertinent part, as a "right to payment" of any kind]).

[5th ed]). Such trust funds are not, however, automatically excluded from the bankruptcy estate without judicial action. In order to have such funds excluded from the estate and turned over to it, a trust beneficiary (including a governmental entity) is required to appear in the bankruptcy case and make a request for such relief, in which the existence of the trust relationship is demonstrated and the trust property is identified and traced (*see City of Farrell v Sharon Steel Corp.*, 41 F3d 92, 95 [3d Cir 1994]; *Matter of Al Copeland Enters., Inc.*, 991 F2d 233, 235 [5th Cir 1993]; *Connecticut Gen. Life Ins. Co. v Universal Ins. Co.*, 838 F2d 612, 618 [1st Cir 1988]; *Yonkers Bd. of Educ. v Richmond Children's Ctr., Inc.*, 58 BR 980, 983 [SD NY 1986] [school district, having proven that certain funds received by debtor were held in trust for the district under state law, was entitled to have such funds excluded from debtor's estate and turned over "to the extent that any of the funds are traceable"]; 5 Collier, Bankruptcy ¶ 541.11).

The foregoing establishes that if the State (or ICSP, had it made payment on the bond when asked to do so) wished to have its rights as the beneficiary of trust funds commingled with the Herkimer estate vindicated, it was not entitled simply to file a proof of claim and then take no further steps to protect that right. It was the role of the bankruptcy court to determine the existence of any trust property in Herkimer's possession, trace it, and order it excluded from the estate (and thus from the collateral securing Herkimer's debt to the Bank) and turned over to the trust beneficiary.[10] It was up to the State (or its actual or potential subrogee), having received notice of the matter, at least to ask the bankruptcy court for the relevant relief and sustain the burden (at that time, a relatively light one) of proving its entitlement thereto.[11]

Although the necessity for the State or its subrogee to take

**10.** Again, Herkimer's finance agreement did not define the collateral in which the Bank had a security interest to exclude the proceeds of unpaid-for tax stamps, and, even if it had, the tax proceeds, rather than being segregated, were commingled with Herkimer's other cash funds subject to the Bank's security interest. Thus, the distinction between the tax proceeds and Herkimer's other cash was not self-executing.

**11.** The majority, citing *City of Farrell v Sharon Steel Corp.* (41 F3d 92 [1994], *supra*), concedes, as it must, that "the State had a right to pursue a claim for prepetition tax proceeds before the bankruptcy court." Nonetheless, the majority contends that we should deny res judicata effect to the foreclosure order that resulted from the State's inaction because the State might have forborne to press its rights out of a desire "not to interfere with Herkimer's attempt to salvage its business." I find it odd that the majority attributes the State's inaction to its supposed concern for the fortunes of an insolvent cigarette wholesaler, which would amount to using the State's tax

steps in the bankruptcy court to reclaim the tax proceeds was obvious, no such steps (beyond the filing of proofs of unsecured claims) were taken.[12] The State took no action, apparently based on its expectation that ICSP, pursuant to Herkimer's bond, would indemnify the State for any loss. ICSP, too, was well aware of Herkimer's bankruptcy, but, in the vain hope of avoiding its liability to the State under the bond, consciously decided not to protect its position in the bankruptcy court. With no one actively asserting the State's claim to the tax proceeds in the bankruptcy case, that claim was extinguished when the bankruptcy court, by its foreclosure order, disposed of all cash in Herkimer's accounts by allowing the Bank to foreclose on its first priority security interest in the "collateral" identified by the finance agreement. The extent of such "collateral" had never been limited by the bankruptcy court to exclude the State's trust property in Herkimer's possession for the simple reason that neither the State nor ICSP ever bothered to ask that court to do so.

Thus, the matter of entitlement to Herkimer's cash assets was disposed of by order of a court of competent jurisdiction while the State and ICSP each remained on the sidelines, deliberately idle and silent. Given the bankruptcy court's final disposition of the matter (from which no appeal was taken), ICSP, as the State's belated and reluctant subrogee, should now be foreclosed from bringing this lawsuit to accomplish something that should have been done—and easily could have been done—in the bankruptcy case six years before this action was commenced. This conclusion is amply supported by the well-established principle (which this Court has previously recog-

proceeds, without the Legislature's approval, to finance the recovery of a distressed private business. In any event, the State's motive for its inaction, whatever it may have been, is legally irrelevant. What is relevant is that the State had the right to request relief in the bankruptcy proceeding, and had the right to appeal in the event such a request were denied. This being the case, ICSP, as the State's subrogee, has no right to ask us to treat the foreclosure order as a nullity.

12. Given the Bank's first priority security interest and the size of the debt it was owed, it also would have been obvious that merely filing proof of an unsecured claim would not protect the State's interest in the tax proceeds in the event the attempt to rehabilitate Herkimer did not succeed (which it ultimately did not). At a minimum, it was necessary for the State or its subrogee to take steps to ensure that, in the event of a liquidation, the tax proceeds would be recovered before any foreclosure by the Bank. Nothing of the sort was ever done. I observe, however, that, if such relief had been requested, and erroneously refused, in the bankruptcy proceeding, the error could only be rectified upon direct appeal (or other direct avenue of relief) from the foreclosure order in the bankruptcy proceeding, not in a subsequent action collaterally attacking the foreclosure order, such as this one.

nized) that a bankruptcy court order approving a sale of estate property (*see* 11 USC § 363 [b])—clearly analogous to the foreclosure order at issue here—is not subject to collateral attack in subsequent litigation (*see York Holdings v Shafran*, 278 AD2d 77 [2000] [bankruptcy court order confirming foreclosure sale, which was not appealed or otherwise timely challenged according to bankruptcy procedures, "conclusively bars any further challenge by defendant to the authorization for the sale of the subject property"]; *see also Regions Bank v J.R. Oil Co., LLC*, 387 F3d 721, 731-732 [8th Cir 2004]; *In re International Nutronics, Inc.*, 28 F3d 965, 970 [9th Cir 1994], *cert denied sub nom. Robertson v Isomedix, Inc.*, 513 US 1016 [1994]; *Hendrick v Avent*, 891 F2d 583, 586-587 [5th Cir 1990], *cert denied* 498 US 819 [1990]; *Matter of Met-L-Wood Corp.*, 861 F2d 1012, 1016 [7th Cir 1988], *cert denied sub nom. Gekas v Pipin*, 490 US 1006 [1989]; *In re Clinton St. Food Corp.*, 254 BR 523, 530 [Bankr SD NY 2000]; 3 Collier, Bankruptcy ¶¶ 363.11, 363.12). Similarly, an order of a bankruptcy court confirming a plan of reorganization (*see* 11 USC § 1129)—another analogue to the foreclosure order in this case—is also entitled to res judicata effect (*see Corbett*, 124 F3d at 87; *Sanders Confectionery Prods., Inc.*, 973 F2d at 480; *Sure-Snap Corp. v State St. Bank & Trust Co.*, 948 F2d 869, 877 [2d Cir 1991]; 8 Collier, Bankruptcy ¶ 1141.02 [4] ["Under the doctrine (of res judicata), questions concerning the . . . disposition of property, may no longer be raised after plan confirmation"]).[13]

The majority's decision never comes to grips with the fact that ICSP's claims against the Bank in this action concern a matter that was finally resolved by the bankruptcy court's foreclosure order. To reiterate, the foreclosure order resolved the matter of in rem entitlement to the funds in Herkimer's bank accounts, considering those funds as a specific item of property, or res, within the bankruptcy court's jurisdiction. As is demonstrated by the above-cited cases giving res judicata effect to orders confirming bankruptcy sales and reorganization plans, a

---

**13.** Indeed, given the in rem nature of the foreclosure order, that order, insofar as it determined ownership of the cash in Herkimer's accounts, arguably was binding on the "entire world," i.e., even on those who were not parties to the bankruptcy case and had not received notice of the proceedings therein (*see Regions Bank v J.R. Oil Co., LLC*, 387 F3d at 732; *Matter of Met-L-Wood Corp.*, 861 F2d at 1017; *In re Clinton St. Food Corp.*, 254 BR at 531; Restatement [Second] of Judgments § 30 [1] and Comment *a*; 3 Collier, Bankruptcy ¶ 363.11). No holding so far-reaching is required to resolve this appeal, since, as previously discussed, the State was a party to the bankruptcy case and no issue has been raised as to its receipt of notice of the relevant proceedings before the bankruptcy court.

final, appealable order of a bankruptcy court determining entitlement to a specific item of property—and the foreclosure order at issue here was just such an order—is not subject to collateral attack in a subsequent proceeding.[14]

Although the majority asserts that the State's (and now ICSP's) purported claims against the Bank did not accrue until the Bank foreclosed on Herkimer's bank accounts, which it did after the foreclosure order was issued, this assertion—assuming it to be correct—only serves to highlight this action's nature as a collateral attack on the foreclosure order. That is to say, the majority itself emphasizes that the Bank is being sued in this action for "misappropriating" precisely the property (the cash in Herkimer's accounts) that the bankruptcy court had previously ruled, in the foreclosure order, belonged to the Bank, and could be taken by the Bank. If this is not a collateral attack on the foreclosure order, I do not know what such an attack would look like.

The majority, like ICSP, seeks to avoid the conclusion that this action is a collateral attack on the foreclosure order by asserting that the proceeds of the tax stamps—although commingled with Herkimer's own cash funds—were not affected by the foreclosure order. Thus, the majority adopts ICSP's theory that, since the foreclosure order permitted the Bank to foreclose on "the collateral securing [Herkimer's] indebtedness to [the Bank]," that order had no effect on the tax proceeds, which were not properly subject to the Bank's lien. However, the appropriate place and time to make an argument for the exclusion of the tax proceeds from "the collateral securing [Herkimer's] indebtedness to [the Bank]" is not here, in an action commenced years after Herkimer's assets were liquidated. Rather, that argument should have been advanced in Herkimer's bankruptcy proceeding, while the bank accounts in which the tax proceeds were commingled still existed. As previously discussed, the proceeds of the tax stamps, being commingled in Herkimer's

---

**14.** I do not believe that the majority meaningfully distinguishes either *York Holdings v Shafran* (278 AD2d 77 [2000], *supra*) or *Regions Bank v J.R. Oil Co., LLC* (387 F3d 721 [2004], *supra*), each of which—like the other cases cited in the same paragraph of this dissent—stands for the proposition that a final order of a bankruptcy court determining the ownership of an item of property constitutes res judicata as to who owns that property. I do not dispute the majority's claim that, in general, claim-preclusive effect is given less readily to orders in bankruptcy proceedings than to orders in ordinary civil litigation. A statement of that general principle does not, however, address whether the specific bankruptcy court order at issue here is entitled to res judicata effect, as against a party to the Herkimer bankruptcy case, concerning which party was entitled to the specific funds of which the order disposed.

bank accounts, were part of Herkimer's bankruptcy estate until the bankruptcy court ordered otherwise. Neither the State nor ICSP ever requested that the bankruptcy court issue such an order.

Not only did both the State and ICSP fail to affirmatively request that the bankruptcy court trace and restore to the State the tax proceeds in Herkimer's possession, the proofs of claim filed by the State and ICSP alleged only an *unsecured* debt owed by Herkimer personally, not that a portion of the funds in Herkimer's bank accounts was held in trust for the State. As the majority itself notes, the State did not assert any claim to funds held "in trust," which would not have been subject to the Bank's lien. Further, the record contains no evidence that the State ever objected to Herkimer's classification of it as an unsecured creditor.[15]

Notwithstanding the failure of both the State and ICSP to assert any in rem claim in the bankruptcy proceeding to the tax proceeds commingled in Herkimer's bank accounts, the majority seems to believe that the Bank should have acted as if such a claim had been asserted. Apparently, it is the majority's view that the Bank should have seen through the proofs of claim the State and ICSP actually filed; intuited that the State (although it had not articulated any such claim) was really entitled to recover a portion of Herkimer's cash as trust property not subject to the Bank's lien; and, on the Bank's own initiative, determined how much of the cash in the bank accounts constituted tax proceeds and turned that amount over to the State. We cannot realistically expect a civil litigant to conduct itself with such altruism.[16]

In any event, the dispositive factor here is not what potential claims or theories of the State (or its future subrogee) the Bank could have anticipated, or even what claims or theories the

**15.** It was the unsecured personal claim asserted in the State's proof of claim that, in the majority's words, "no one even questioned" in the bankruptcy proceeding. Again, given the Bank's first-priority security interest, and the amount Herkimer owed the Bank, none of Herkimer's unsecured creditors recovered anything when Herkimer was finally liquidated.

**16.** As purported evidence that the Bank had notice that the proceeds of the tax stamps were trust funds, the majority points to a letter from the State Department of Taxation and Finance to the Bank's legal counsel, dated December 19, 1997. This letter, however, simply did not address the status of the proceeds of tax stamps. Rather, the letter advised the Bank that it could "never acquire a secured interest in *cigarette tax stamps* whether affixed . . . or not" (emphasis added). Moreover, the December 19 letter states that the inquiry to which this remark responded was "whether [the Bank] may have a lien on properly affixed cigarette tax stamps and/or on the properly taxed cigarettes."

State (or its future subrogee) actually asserted in the bankruptcy proceeding. Rather, the dispositive factor is that the disposition of the res at issue in ICSP's claims against the Bank—the tax proceeds commingled in Herkimer's bank accounts—was a matter committed to the jurisdiction of the bankruptcy court, concerning which the State had, but chose not to exercise, a right to be heard. The bankruptcy court, in the foreclosure order, finally determined the disposition of the tax proceeds in question by permitting the Bank to foreclose on all of the cash in Herkimer's accounts. Any claim that the funds in question were not subject to the Bank's lien should have been asserted in the bankruptcy court and, if necessary, on a direct appeal from the bankruptcy court's order. To paraphrase a decision quoted by the majority, it was simply "unreasonable [for the State] not to have [asserted its in rem claim to the tax proceeds] . . . in the bankruptcy forum" (*Eastern Mins. & Chems. Co. v Mahan*, 225 F3d 330, 338 [3d Cir 2000]) in the course of the proceedings leading up to the foreclosure order. To the extent the bankruptcy court, in the foreclosure order, erred (as a result of the inaction of the State and ICSP) by failing to honor the State's right to recover the tax proceeds in Herkimer's possession, it is inappropriate for ICSP to seek to have that error corrected in a new action commenced years later, in a different court system.

At the end, this action revolves around the disposition of funds beneficially owned by the State that Herkimer had collected on the State's behalf and deposited in its bank accounts, which accounts became subject to the jurisdiction of the bankruptcy court when Herkimer went into bankruptcy in November 1997. The State and ICSP, which had bonded Herkimer, were both fully aware of the bankruptcy proceeding, and filed proofs of claim in that proceeding, but took no further steps to pursue that claim before the bankruptcy court. In February 2004, six years after Herkimer's assets were liquidated, ICSP, having finally paid what it owed the State under Herkimer's bond, commenced this action to collect the subject funds as the State's subrogee, pursuing a claim that the State (and ICSP itself) had already had a full and fair opportunity to litigate in the bankruptcy proceeding. In that earlier proceeding, due to the deliberate silence of the State and ICSP, the bankruptcy court—not having had the benefit of the arguments ICSP now belatedly makes to us—issued an order that, by permitting the Bank to foreclose its lien on Herkimer's bank accounts, necessarily foreclosed any adverse claim to the funds in those accounts, including the State's. I see no reason why we should bend the established rules of res judicata to permit ICSP to revisit the matter now.