15-4185-cv
Brown Media Corporation v. K&L Gates, LLP

# In the
# United States Court of Appeals
# For the Second Circuit

_____

August Term, 2016

(Argued: November 4, 2016      Decided: April 14, 2017)

Docket No. 15-4185-cv

_____

BROWN MEDIA CORPORATION, ROY E. BROWN,

*Plaintiffs-Appellants*,

v.

K&L GATES, LLP, EDWARD M. FOX, ERIC T. MOSER,

*Defendants-Appellees*.

_____

Before:
        HALL, LIVINGSTON, *Circuit Judges*, AND GARAUFIS, *District Judge*.[*]

_____

On appeal from an order of the United States District Court for the Eastern District of New York (Spatt, *J.*), granting the defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6) on the grounds that res judicata bars plaintiffs' claims for breach of fiduciary duty, tortious interference with contract and

_____

[*] Judge Nicholas G. Garaufis, of the United States District Court for the Eastern District of New York, sitting by designation.

common law fraud against defendant law firm and attorneys who represented plaintiffs in connection with their proposed purchase of the assets of a debtor in bankruptcy. Because the plaintiffs' claims are not of the sort that should have been raised in the underlying bankruptcy proceedings nor do they implicate the validity of the asset sale confirmed in the bankruptcy proceedings, res judicata does not bar them. The judgment of the district court is vacated.

VACATED AND REMANDED.

> DANIEL ABRAMS, Law Office of Daniel L. Abrams, PLLC, New York, NY, *for Plaintiffs-Appellants*.
>
> ANTHONY C. ACAMPORA, Silverman Acampora LLP, Jericho, NY, *for Defendants-Appellees*.

HALL, *Circuit Judge*:

The plaintiffs appeal from an order of the United States District Court for the Eastern District of New York (Spatt, *J.*), dismissing their action asserting claims for breach of fiduciary duty, tortious interference, and common law fraud against the law firm K&L Gates, LLP and two of its former partners. The plaintiffs, unsuccessful bidders in a bankruptcy proceeding, alleged that the defendants used their prior representation of the plaintiffs to undermine the plaintiffs' attempt to acquire assets in a bankruptcy sale. The district court granted the defendants' motion to dismiss on res judicata grounds, reasoning that the plaintiffs could have raised their claims during the course of the

2

bankruptcy proceedings and that allowing the plaintiffs' action to go forward would call into question the integrity of the bankruptcy court's final orders.

On appeal, the plaintiffs argue that they could not have brought their claims during the bankruptcy proceedings, and this present action will not disturb the orders of the bankruptcy court. We agree. For the following reasons we REVERSE the district court's decision, VACATE the judgment, and REMAND the case for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background

K&L Gates ("K&L"), a large international law firm, and its former partners Edward Fox and Eric Moser (collectively, "the defendants"), represented Brown Publishing Company, Brown Media Holdings Company, and their affiliates (collectively, "Brown Publishing") in Brown Publishing's Chapter 11 bankruptcy.

Plaintiff Roy Brown was the former Chief Executive Officer, as well as a former shareholder, manager, and director of Brown Publishing. Brown and other Brown Publishing insiders owned and controlled plaintiff Brown Media Corporation ("Brown Media" and, together with Brown, "the plaintiffs"), which they formed to purchase Brown Publishing's assets in a bankruptcy auction. The

3

plaintiffs' action arises out of events that occurred just prior to and during Brown Publishing's bankruptcy proceeding.

Because we are reviewing the dismissal of plaintiffs' complaint, we draw the following facts from the complaint and present them in the light most favorable to the plaintiffs. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).

## A. Pre-Bankruptcy

Before entering bankruptcy, Brown Publishing was a closely-held corporation controlled by Roy Brown, his brother Clancy Brown, their parents— Bud and Joyce Brown; Brown Publishing's former General Counsel Joel Dempsey, and Joe Ellingham (collectively, the "Managers"). At an unspecified time, Brown Publishing received financing from a company known as Windjammer Capital ("Windjammer"), with an equity option as part of the financing arrangement.

In late 2008, the Managers grew concerned that Windjammer was on the verge of exercising its option, which might have resulted in the Managers losing control of Brown Publishing. The Managers decided to seek legal advice. To that end, Dempsey sent a memorandum to K&L and Fox requesting legal advice

4

regarding, *inter alia*, the following: (a) "the legal ramifications of a proposed transaction whereby the Managers create a new LLC and Managers Roy, Dempsey and Ellingham acquire the assets of Brown Publishing through the new LLC," a transaction that would "take place outside of bankruptcy"; (b) "what actions to take, if any, with regards to Windjammer Capital"; (c) "possible successor liability related to the proposed transaction"; (d) "what state would be an advantageous one for incorporation of the new LLC"; (e) "the tax consequences to the Managers"; and (f) "other issues pertaining to Brown Publishing's lenders." App'x 14.

In response to the memorandum, K&L and Fox "provided advice directly to Roy and Dempsey," advising them that "unless Brown Publishing was brought through a bankruptcy process, successor liability could flow to the shareholders of the new LLC." App'x 14. K&L and Fox, however, further advised Roy and Dempsey that, if the transaction took place outside of a bankruptcy, steps could be taken to reduce these concerns. K&L billed the Managers for the time devoted to providing these legal services.

By March 2009, Brown Publishing was on the verge of defaulting on its loan from Windjammer, prompting the Managers to take a series of actions to

5

protect Brown Publishing's assets. Later that month, the Managers followed the advice of K&L and entered into an agreement to execute a non-bankruptcy transaction similar to that contemplated in the memorandum Dempsey had provided to K&L. When the transaction did not have the desired result, Dempsey again sought the advice of Fox, who advised the Managers that a sale of Brown Publishing's assets in bankruptcy was the best way to retain control of the company. K&L also advised Roy and Dempsey that they could purchase Brown Publishing's assets through a sale pursuant to 11 U.S.C. § 363, which authorizes the bankruptcy court to conduct a sale of the bankruptcy debtor's assets even outside the ordinary course of business. *See generally In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (discussing the circumstances permitting the bankruptcy court to conduct a § 363 sale process). The Managers rescinded the March 2009 transaction and, pursuant to K&L's advice, ushered Brown Publishing into bankruptcy.

In June 2009, K&L notified Roy and Dempsey that the firm was interested in representing Brown Publishing in its bankruptcy proceeding. K&L, however, did not seek or obtain a waiver or consent from the Managers to do so. In July 2009, Brown Publishing retained K&L as counsel.

In August 2009, K&L and Dempsey began preparing a "'stalking horse"[1] asset purchase agreement (the "APA"), which was designed to "further the ultimate goal of being able to obtain the assets with the blessing of the bankruptcy court." App'x 16. K&L also allegedly "continued to serve as the Managers' counsel, despite having been retained by Brown Publishing." App'x 16. In addition to preparing the APA, K&L advised the Managers on how to maximize the chances that a bankruptcy court would approve their bid at a bankruptcy sale. K&L also advised the Managers with respect to forming Brown Media (the company that would make the "stalking horse" bid), and assisted the Managers in their effort to convince Brown Publishing's lenders to finance the Managers' purchase. With the help of K&L, the Managers obtained a funding commitment through Guggenheim Partners to support their purchase offer.

Shortly before Brown Publishing filed for bankruptcy, K&L did urge the Managers and Brown Media to obtain new counsel. On Fox's recommendation, the plaintiffs hired Richard Levy, Fox's friend and former partner. By the time Levy was hired, however, Brown Media had been formed and much of the APA had been drafted.

---

[1] A "stalking horse" contract "is a first, favorable bid strategically solicited by the bankrupt company to prevent low-ball offers." *In re WestPoint Stevens, Inc.*, 600 F.3d 231, 239 n.3 (2d Cir. 2010).

## B. The Bankruptcy Filing

In April 2010, Brown Publishing filed for Chapter 11 bankruptcy. As part of the bankruptcy court's approval of K&L as Brown Publishing's counsel, the firm submitted a disclosure statement which did not reveal K&L's prior representation of the Managers or the extent of its relationship with members of the PNC Bank Group, a rival bidder for Brown Publishing's assets.

After the bankruptcy filing, Brown Publishing received a credit bid from the PNC Bank Group. That bid, however, was rejected as inferior to the Managers' stalking horse bid. Thus, in May 2010, Brown Publishing, advised by K&L, executed the APA and sought the bankruptcy court's approval of the sale of its assets to the Managers through Brown Media. The bankruptcy court approved the Managers' bid, and, at the same time, approved procedures for the eventual sale of Brown Publishing's assets should an auction become necessary.

Although the Managers had retained Levy to represent them, K&L "continued to treat them like clients," advising Roy on how to answer questions at a creditors meeting and gathering with some of the Managers to discuss issues relating to the bankruptcy, all without Levy present. App'x 20.

## C. The Foreclosure Action and the Defendants' Alleged Fraudulent Scheme

CRJ Investments, an affiliate of Brown Publishing, was owned by Roy, Dempsey, and Roy's brother. "CRJ owned the real estate which housed all of [Brown Publishing's] manufacturing operations and a substantial majority of [its] profit generating operations." App'x 21. Importantly, Brown Media's bid had been deemed superior, in part because, under the APA, Brown Media agreed to assume Brown Publishing's leases with CRJ.

CRJ's sole lender was Huntington Bank, which also happened to be a member of the PNC Bank Group. As noted above, PNC Bank Group had submitted a last-minute competing offer for Brown Publishing's assets. Huntington Bank was also a creditor of Brown Publishing and a sometime client of K&L.[2] In June 2010, Huntington Bank filed a foreclosure action against CRJ in an Ohio state court, a move designed to reduce the value of Brown Media's assumption of the CRJ leases, thereby undermining the plaintiffs' bid for Brown Publishing's assets.

The foreclosure action violated the bankruptcy stay, and Dempsey, in his capacity as Brown Publishing's General Counsel, directed K&L promptly to file a

---

[2] The plaintiffs did not allege in their complaint that the defendants represented Huntington Bank in either the bank's role as a creditor of Brown Publishing or member of the PNC Bank Group.

9

motion to enforce the automatic stay. Through its representation of the plaintiffs, K&L "was well aware" that the leases owned by CRJ were "a critical component of the Managers' strategy, and of considerable importance to Guggenheim, [which] was funding the Managers' bid." App'x 21. K&L, however, deliberately delayed filing the stay motion until after the final review of the bids for Brown Publishing's assets so that the PNC Bank Group would be the successful bidder. In light of these events, K&L declared the PNC Bank Group's bid to be the superior bid, which necessitated an auction of Brown Publishing's assets.

## D. The Auction

In July 2010, K&L's New York office hosted an auction for Brown Publishing's assets. Because Brown Media's financing had fallen through in the wake of the foreclosure action, the PNC Bank Group was successful in acquiring most of Brown Publishing's assets. Following the auction, K&L successfully moved in the Huntington Bank foreclosure action to enforce the automatic bankruptcy stay. By then, however, it was too late for the plaintiffs to salvage their bid.

10

## II.    Procedural Background

Alleging the facts set forth above, the plaintiffs filed this lawsuit asserting the following causes of action: (1) breach of fiduciary duty based on the defendants' (a) failure to secure a waiver of the conflict of interest presented by their dual representation of the Managers and Brown Publishing, (b) failure to disclose their relationship with members of the PNC Bank Group, and (c) use of confidential information gleaned from K&L's representation of the plaintiffs to manipulate the bidding process in favor of the PNC Bank Group; (2) tortious interference with prospective economic advantage based on the defendants' interference with the relationship between the Managers and Brown Publishing; and (3) common law fraud based on the defendants' breach of their duty to disclose potential conflicts of interest.  The plaintiffs sought an unspecified amount of damages.  In connection with their claim for breach of fiduciary duty, however, the plaintiffs asserted that damages would "include a calculation based in part on the value of the assets [they] were unable to purchase due to [the defendants'] breach of fiduciary duty, and where [the plaintiffs] would have been financially with respect to the assets had they succeeded in obtaining the assets as contemplated in the APA."  App'x 25.

The defendants moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim, arguing, *inter alia*, that the plaintiffs' claims were barred by res judicata and, in particular, by the preclusive effect of three final orders of the bankruptcy court: (1) the "Sale Procedures Order," which approved procedures for the eventual sale of Brown Publishing's assets; (2) the "Sale Approval Order," which authorized the sale of Brown Publishing's assets, and (3) the "Confirmation Order," which confirmed the Third Amended Joint Chapter 11 Plan of Liquidation of Brown Publishing and its affiliates ("the Liquidation Plan").

The district court granted the defendants' motion on res judicata grounds. It noted that the parties disputed only one prong of the res judicata analysis: "whether the causes of action were the same, and if not, whether the claims asserted by the Plaintiffs in this action could have been brought in the prior proceeding." Special ("Sp.") App'x 23. The court explained that, because none of the three bankruptcy orders cited by the defendants' in their motion to dismiss "directly or sufficiently addresse[d] the causes of action asserted in this case," "there [was] no indication that [K&L's] allegedly improper dual representation,

12

the issue which dominate[d] the entire complaint in this action, was raised at the time of the [b]ankruptcy [o]rders."[3] Sp. App'x 23.

The court observed, however, that whether the plaintiffs *could* have asserted their present claim in the bankruptcy court was "a closer question." Sp. App'x 23. The court determined that the plaintiffs' action was "a thinly disguised collateral attack on the [b]ankruptcy [o]rders." Sp. App'x 25 (internal quotation marks and citation omitted). The court reasoned that the plaintiffs sought "to challenge the result of the § 363 sale by placing themselves in the same position as if they had been the successful bidders of Brown Publishing's assets," as evidenced by their "demand for compensation to restore them to where [they] would have been financially with respect to these assets had they succeeded at the auction." Sp. App'x 25–26 (internal quotation marks omitted). In the district court's view, obtaining this relief would "call into question the integrity" of the final bankruptcy orders, a result that "would impair, destroy, challenge, or invalidate the enforceability or effectiveness of the original reorganization plan, whether the sale [was] unwound or not." Sp. App'x 26 (internal quotation marks omitted). The court observed further that the

_____

[3] The district court took judicial notice under Rule 12(d) of the relevant bankruptcy court orders.

plaintiffs, as unsuccessful bidders who were "complaining about fraudulent collusion among the sale participants," had standing to raise the issue of collusion during the auction. Sp. App'x 27 (internal quotation marks and alteration omitted).

The court explained that, ultimately, the plaintiffs' action was "so inextricably linked" to the underlying bankruptcy proceeding that the relief sought by the plaintiffs would require the court "to effectively overrule" the bankruptcy court's orders. Sp. App'x 29. According to the district court, any policy interest in allowing the plaintiffs to proceed with their action was "outweighed by the longstanding policy favoring the finality of sale orders issued by bankruptcy courts." Sp. App'x 29–30.

This appeal followed.

## DISCUSSION

### I.

We review *de novo* a grant of a motion to dismiss pursuant to Rule 12(b)(6), "accepting the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiff's favor." *Carpenters Pension Tr. Fund*, 750 F.3d at 232 (quoting *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014)). "To survive a

14

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A district court's application of res judicata is also reviewed *de novo*. *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 498 (2d Cir. 2014).

**II.**

"The doctrine of *res judicata*, or claim preclusion, holds that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). "To determine whether the doctrine of res judicata bars a subsequent action, we consider whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same." *In re Layo*, 460 F.3d 289, 292 (2d Cir. 2006) (quoting *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 87–88 (2d Cir. 1997)). "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or series of transactions is at issue, whether the same evidence is needed to support both

claims, and whether the facts essential to the second were present in the first."

*Monahan*, 214 F.3d at 285 (quoting *NLRB v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983)).

"In the bankruptcy context, we ask as well whether an independent judgment in a separate proceeding would impair, destroy, challenge, or invalidate the enforceability or effectiveness of the reorganization plan." *In re Layo*, 460 F.3d at 292 (quoting *Corbett*, 124 F.3d at 87–88); *see also Sure-Snap Corp. v. State St. Bank and Tr. Co.*, 948 F.2d 869, 874 (2d Cir. 1991) ("Also dispositive to a finding of preclusive effect, is whether an independent judgment in a separate proceeding would 'impair or destroy rights or interests established by the judgment entered in the first action.'" (quoting *Herendeen v. Champion Int'l Corp.*, 525 F.2d 130, 133 (2d Cir. 1975)). A party cannot avoid the preclusive effect of res judicata "by asserting a new theory or a different remedy." *Sure-Snap Corp.*, 948 F.2d at 875 (quoting *Matter of Howe*, 913 F.2d 1138, 1144 n.10 (5th Cir. 1990)). "The burden is on the party seeking to invoke *res judicata* to prove that the doctrine bars the second action." *Comput. Assocs. Int'l v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir. 1997).

**A.**

As below, the plaintiffs focus their argument on whether the causes of action they are advancing against the defendants were addressed in the bankruptcy proceeding and whether, in any event, they could have brought their present claims during the bankruptcy proceedings. For the reasons stated below, we vacate the judgment and remand for further proceedings.

At the outset, as other courts have observed, the standard res judicata analysis can be an awkward fit when applied to bankruptcy proceedings. *See, e.g., In re Piper Aircraft Corp.*, 244 F.3d 1289, 1299 (11th Cir. 2001) (noting that, given the unique nature of bankruptcy proceedings, "different res judicata considerations may come into play when the first case is a bankruptcy proceeding"); *see also HSBC Bank USA v. Adelphia Commc'ns Corp.*, No. 07-CV-553A, 2009 WL 385474, at *12 (W.D.N.Y. Feb. 12, 2009), *aff'd sub nom. In re Adelphia Recovery Tr.*, 634 F.3d 678 (2d Cir. 2011) ("Because a bankruptcy case is fundamentally different from the typical civil action, comparison of a bankruptcy proceeding with another proceeding is not susceptible to the standard *res judicata* analysis. Rather, the Court must scrutinize the totality of the circumstances in each action and then determine whether there is identity of causes of action.")

17

(citing *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 n.5 (3d Cir. 1988)).  Unlike a typical lawsuit, where one party brings an action against another, a bankruptcy proceeding provides a forum for multiple parties—debtors, creditors, bidders, etc.—to sort out how to allocate, among other things, a debtor's assets.  In other words, a bankruptcy court's foremost concern is maximizing the value of the debtor's estate.  *See In re Piper Aircraft Corp.*, 244 F.3d at 1300 (observing that when confirming a debtor's Chapter 11 plan, a bankruptcy court is "primarily determining whether the plan, as presented, [meets] the literal requirements and policy objectives of the Bankruptcy Code by maximizing the value of [the debtor's] estate").  In the bankruptcy context, therefore, instead of examining whether a subsequent lawsuit asserts claims that could have been included as part of a previous lawsuit, courts have assessed whether a new action seeks to bring claims that could have been raised and litigated within the scope of the bankruptcy proceeding.  *See, e.g., Sure-Snap*, 948 F.2d at 873–75 (noting the fact that plaintiffs "*could* have brought [their] actions" during the bankruptcy proceeding was "germane to a finding of res judicata, since that doctrine bars re-litigation not just of those claims which were brought in a prior proceeding, but of any other admissible matter which could have been

18

brought, but wasn't" (internal quotation marks omitted)). We are tasked here with resolving this question.

It is undisputed that the plaintiffs did not inform the bankruptcy court of the defendants' alleged conduct prior to the confirmation of the Liquidation Plan. The issues surrounding the defendants' alleged conduct were thus not litigated or explored during the course of the bankruptcy proceedings.[4] The district court was, therefore, correct that the issues had not been fully and fairly litigated prior to the bankruptcy orders identified by the defendants as having preclusive effect.

The district court nonetheless identified at least one way in which the plaintiffs could have vindicated their rights against the defendants in bankruptcy court. It posited that the plaintiffs, as unsuccessful bidders, "likely would have had standing" to assert their claims in similar fashion to the plaintiffs in *In re Colony Hill Assocs.*, 111 F.3d 269 (2d Cir. 1997). Sp. App'x 28. In *Colony Hill*, a disqualified bidder was denied an opportunity to place a bid at a bankruptcy sale because the next highest bidder had fraudulently colluded with the other sale participants to exclude the disqualified bidder. 111 F.3d at 271–72. We held

---

[4]  It appears the bankruptcy court was not made aware of K&L's potential conflict until approximately one year after the Liquidation Plan was confirmed, when Roy Brown moved to disqualify K&L as counsel for the liquidating trust.

19

that the disqualified bidder had standing to challenge whether the successful bidder was a "good faith purchaser" because the alleged conduct by the successful bidder, "if proven, would call into question the 'intrinsic fairness' of the sale hearing." *Id*. at 274. We explained that, "when collusion occurs between a debtor, creditors and a successful bidder, the unsuccessful bidder may be the only party with an interest in exposing such inequitable conduct." *Id*.

We do not view the gravamen of the complaint here as alleging the type of collusion at issue in *Colony Hill*. Rather, the plaintiffs focus the vast majority of their allegations on the conduct of K&L, and Fox in particular. To be sure, there are isolated allegations that suggested a semblance of collusion. The plaintiffs allege, for example, that Huntington Bank, a member of the PNC Bank Group, filed the foreclosure action against CRJ to ensure that the PNC Bank Group's bid would prevail at the bankruptcy sale. However, although the plaintiffs alleged that K&L was "well aware" that CRJ's leases were of strategic importance to the Managers' bid, the plaintiffs did not assert that Huntington Bank's foreclosure action was orchestrated by the defendants or done at their behest. App'x 21. Indeed, referencing Huntington Bank's foreclosure action simply provided context for the true target of the plaintiffs' claim: the defendants' allegedly

20

conflict-ridden decision to delay filing a motion in the foreclosure action to enforce the bankruptcy stay.[5]

In our view, therefore, the complaint is fairly read to allege misconduct only on the part of the defendants. Thus, because the plaintiffs are not alleging collusion among the defendants and the PNC Bank Group (through Huntington Bank's foreclosure action) or Brown Publishing (through Carlson), it was not incumbent on the plaintiffs to challenge in the bankruptcy court the "good faith purchaser" status of the PNC Bank Group or, more generally, the "intrinsic fairness" of the bankruptcy sale on grounds of collusion.

We acknowledge that, had the plaintiffs alerted the bankruptcy court to defendants' conduct during bankruptcy proceedings, the bankruptcy court likely would have considered whether the defendants' conflict of interest and other mischief warranted their removal as Brown Publishing's counsel. *See, e.g., In re Congoleum Corp.*, 426 F.3d 675, 686 (3d Cir. 2005) (observing in the bankruptcy context that "the obligation to ensure that professional ethics are followed has led courts to rule that counsel has standing to raise and challenge unethical

---

[5] We note, however, that plaintiffs' allegations with respect to the defendants' decision to have Brown Publishing hire Tom Carlson as an independent director for the duration of the bankruptcy process and that Carlson did not perform adequately in that role touch, at their core, on the adequacy of the defendants' representation of *the debtor* in the bankruptcy proceeding and thus cannot properly serve as the basis for plaintiffs' suit here.

21

procedures on the part of opposing lawyers," and that "[r]ules governing professional conduct are often viewed as more necessary and applicable in bankruptcy cases than in other contexts"). Removing the defendants as Brown Publishing's counsel, however, would have addressed only the defendants' failure to disclose its conflict of interest to the court, either in its initial disclosure statement or pursuant to an attorney's obligations as an officer of the court. The defendants' removal would not have provided the plaintiffs a fair forum in which to litigate fully the claims it now brings against them. These claims seek to remedy not simply the fact of a conflict but the defendants' effective interference with the plaintiffs' attempt to acquire the debtor's assets. Although consideration of the defendants' potential conflict of interest may have prompted the bankruptcy court to examine some of the facts necessary to support the present claims, the factual overlap is limited by the proper framing of each claim. Defendants point us to no case in which the fact of an attorney's conflict in one action will bar a subsequent action for malpractice or breach of fiduciary duty. Thus, even if the plaintiffs objected to, and successfully blocked, the sale of Brown Publishing's assets to the PNC Bank Group, this would not have been equivalent to asserting the present claims, which, as described above, are not

22

limited to the mere fact of a conflict of interest. *See In re Piper Aircraft Corp.*, 244 F.3d at 1303 (observing that "[m]erely objecting to the [confirmation] plan would not have been the equivalent of pursuing the [breach of fiduciary duty and breach of agreement] claims [the plaintiff] asserts in state court" against the successful plan proponent). Here, objecting to the plan "would not have provided a complete substitute for the relief sought in the [instant] action." *Id*. at 1304.

The defendants assert on appeal that bankruptcy courts have "arising in" jurisdiction over "malpractice and similar claims against a debtor's retained professionals that occur during a bankruptcy because they are inseparable from the bankruptcy context." Defs.-Appellees' Br. 22. Thus, defendants contend the bankruptcy court could have exercised jurisdiction over the plaintiffs' claims.[6]

The defendants are referring to the "plenary jurisdiction" bankruptcy courts enjoy "over 'all cases under [T]itle 11 and all core proceedings arising under [T]itle 11, or arising in a case under Title 11.'" *Baker v. Simpson*, 613 F.3d

_____

[6] The defendants did not mention "arising in" jurisdiction in their motion to dismiss, and the district court did not address such jurisdiction in its order dismissing the plaintiffs' action. While we prefer not to speculate in the first instance as to whether the bankruptcy court had "arising in" jurisdiction to consider the plaintiffs' claim, we are not precluded from entertaining the argument given that "[w]e are free to affirm on any ground that finds support in the record, even if it was not the ground upon which the [district] court relied." *Headley v. Tilghman*, 53 F.3d 472, 476 (2d Cir. 1995).

346, 350 (2d Cir. 2010) (quoting *Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 447–48 (2d Cir. 2005)). We have indeed held that bankruptcy courts have jurisdiction to consider, for example, a debtor's malpractice (and related conversion, negligence, fraud, and intentional misrepresentation) claims against the debtor's bankruptcy counsel because the adjudication of those claims was "an essential part of administering the estate" and "implicate[d] the integrity of the entire bankruptcy process." *Baker*, 613 F.3d at 351 (internal quotation marks omitted). As we observed in *Baker*, "while the meaning of the statutory language 'arising in' may not be entirely clear, it is clear to us that the bankruptcy court has the ability to review the conduct of attorneys . . . who are appointed by the court to aid a person in need of counsel in a proceeding pursuant to Title 11." *Id.* at 351 (internal citation omitted); *see also Grausz v. Englander*, 321 F.3d 467, 469, 471–72 (4th Cir. 2003) (holding that a professional malpractice claim, filed by a Chapter 11 debtor against the firm that represented him in that proceeding, "arose in the bankruptcy case"). The present case, of course, was not brought by the debtor against his bankruptcy counsel, and the defendants do not contend that the plaintiffs could have presented their claims in the posture described in *Baker*. Rather, the defendants argue that the plaintiffs' claims "are rooted in, and

would have no existence but for, the Debtor's bankruptcy case." Defs.-Appellees' Br. 22–23. While we observed in *Baker* that the bankruptcy court had "arising in" jurisdiction over the debtor's malpractice and other claims against his bankruptcy counsel, in part, because those claims "would have no practical existence *but for* the bankruptcy," *Baker*, 613 F.3d at 351 (internal quotation marks omitted), we do not view this general principle as dispositive in the circumstances before us here. First of all, the *Baker* court was wrestling with whether a bankruptcy court was required to abstain from even considering the debtor's claims against counsel, not whether the debtor's failure to raise an issue in bankruptcy court meant that some third party was barred by res judicata from bringing a later suit. Moreover, just because a bankruptcy court need not abstain from exercising jurisdiction over a claim does not mean that failing to ask the bankruptcy court to exercise its "arising in" jurisdiction necessarily precludes a plaintiff's future claim. In any case, as already explained, the plaintiffs' claims here do not involve the parties to the bankruptcy proceedings making the jurisdictional nature of claims brought by parties to the bankruptcy proceeding irrelevant.[7]

---

[7] We observed in *Baker* that "[t]o hold that mandatory abstention barred the district court from

25

For their part, the plaintiffs argue that they could have brought their claims only through an adversary proceeding, over which the bankruptcy court lacked jurisdiction. Courts, including ours, have held that "[a]lthough confirmed plans are *res judicata* to issues therein, the confirmed plan has no preclusive effect on issues that must be brought by an adversary proceeding." *Whelton v. Educ. Credit Mgmt. Corp.*, 432 F.3d 150, 154 (2d Cir. 2005), *abrogated on other grounds by United Student Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) (quoting *Enewally v. Wash. Mut. Bank*, 368 F.3d 1165, 1173 (9th Cir. 2004)); *see Cen-Pen Corp. v. Hanson*, 58 F.3d 89, 93 (4th Cir. 1995) (observing that confirmation of a bankruptcy plan "is res judicata only as to issues that can be raised in a less formal procedure for contested matters," and confirmation "generally cannot have [a] preclusive effect as to [matters] which must be resolved in an adversary proceeding"). We need not resolve, however, whether an adversary proceeding was the only way in which the plaintiffs could have litigated the claims in their present lawsuit. It is enough to hold here that the circumstances did not demand that plaintiffs raise their claims in the bankruptcy proceeding, and to note that the relevant issues

---

disposing of [the debtor's] claims would undermine the efficient administration of bankruptcy proceedings." *Baker*, 613 F.3d at 351. Here, it would likely have been entirely *inefficient* for the bankruptcy court to distract itself by dealing with a dispute that, as pleaded in the complaint, did not involve the debtor, creditors, or the successful bidder.

were not litigated through an adversary proceeding or otherwise. *See, e.g.*, *In re Piper Aircraft Corp.*, 244 F.3d at 1297 ("That the critical facts underlying [the plaintiff's] suit were never discussed by the bankruptcy court or litigated by the parties is powerful evidence that the Chapter 11 case did not involve the 'same cause of action' as the state court suit" for breaches of fiduciary and contractual duties); *Cen-Pen Corp.*, 58 F.3d at 93 (observing that "if an issue must be raised through an adversary proceeding it is not part of the confirmation process and, unless it is actually litigated, confirmation will not have a preclusive effect" (internal quotation marks and notations omitted)). In any case, it is the defendants' burden to prove that res judicata bars the second action, not the plaintiffs' to prove that they are not barred. *Comput. Assocs.*, 126 F.3d at 369.

For the foregoing reasons we disagree with the district court that the plaintiffs could have, and should have, raised their present claims in the bankruptcy proceeding.

**B.**

The district court further concluded that the "practical effect of the relief sought" by the plaintiffs would "call into question the integrity" of the bankruptcy court's orders, which would "invalidate the enforceability or

27

effectiveness of the original reorganization plan, whether the sale is unwound or not." Sp. App'x 26 (internal quotation marks omitted). We do not share this view.

As explained above, "dispositive to a finding of preclusive effect, is whether an independent judgment in a separate proceeding would 'impair or destroy rights or interests established by the judgment entered in the first action.'" *Sure-Snap Corp.*, 948 F.2d at 874 (quoting *Herendeen*, 525 F.2d at 133). Initially, although the plaintiffs did not formally seek rescission of the bankruptcy orders, that fact alone does not end the inquiry. We have held that though a subsequent lawsuit may "not technically ask[] the district court to disturb" a final bankruptcy order, the subsequent action is barred by res judicata when "appellants' failure to raise these claims (if valid) when they should have, almost certainly affected that prior judgment." *Sure-Snap Corp.*, 948 F.2d at 876. This is because "[h]ad the bankruptcy court found merit in appellants'" challenge to an aspect of the proceedings, the bankruptcy court "would have structured a different disposition." *Id.*

Under the circumstances, we are not persuaded that, had the plaintiffs' asserted their present claims in bankruptcy court or sought to litigate the issues

28

necessary to those claims, the bankruptcy court would have structured a different disposition vis-à-vis the Liquidation Plan. Again, as explained above, the plaintiffs' allegations are not aimed at the parties subject to the bankruptcy court orders—the PNC Bank Group, the creditors, and Brown Publishing—but at K&L and two of its former partners. Because the factual allegations in the complaint do not implicate the parties to the bankruptcy proceedings, the plaintiffs' failure to raise their claims against the defendants in bankruptcy court did not "almost certainly affect" bankruptcy orders that pertained *only* to the parties participating in the bankruptcy proceedings. *Sure-Snap Corp.*, 948 F.2d at 876. Likewise, even if the bankruptcy court had concluded that the defendants failed to disclose a conflict of interest or had engaged in misconduct, still, as concluded above, there was no basis for the bankruptcy court to have imputed such conduct to the auction participants and the parties subject to the Liquidation Plan.

Finally, a key component of the plaintiffs' allegations is that, as a result of defendants' actions, plaintiffs' financing fell through and they were unable to bid effectively at the auction of Brown Publishing's assets. In other words, by the

29

time the plaintiffs' allegations were ripe, any hearing on these claims would not have changed the outcome of the auction process.

For these reasons, we disagree that the plaintiffs' action was "so inextricably linked to the underlying bankruptcy proceeding that the relief the Plaintiffs seek would require [the district court] to effectively overrule the [b]ankruptcy [o]rders." Sp. App'x 29. Indeed, a judgment against the defendants will have no effect on the continuing validity of the bankruptcy court's order approving the sale of Brown Publishing's assets to the PNC Bank Group or the order confirming the Liquidation Plan.[8] *Cf. In re Brook Valley VII, Joint Venture*, 496 F.3d 892, 899 (8th Cir. 2007) (holding that a trustee's action for breach of fiduciary duty against the winning bidders, who were on both sides of a bankruptcy transaction, was "not an impermissible collateral attack on a final

---

[8] Although the plaintiffs did not denominate a quantum of damages in their complaint, they asserted that damages for their claim for breach of fiduciary duty would be based, in part, "on the value of the assets [they] were unable to purchase due to [the defendants'] breach of fiduciary duty," which would put them where they "would have been financially" if they had "succeeded in obtaining the assets as contemplated in the APA." App'x 25. By framing their potential damages this way, they may have inadvertently invited the district court to view their action as an attack on the final bankruptcy orders. While we decline to comment on the appropriate measure of damages were the plaintiffs to prevail, we do not view the plaintiffs' request for damages obtainable solely by way of a judgment and expectation against defendants K&L, Fox, and Moser, as evincing any desire to attack the bankruptcy orders. We also note that "res judicata turns primarily on the commonality of the *facts* of the prior and subsequent actions, not on the nature of the remedies sought." *In re Piper Aircraft Corp.*, 244 F.3d at 1295 (emphasis in original).

sale" because the trustee sought "a remedy for an alleged breach of fiduciary duty," which "presume[d] the continued validity of the foreclosure sale itself").

We are mindful that bankruptcy proceedings are "a forum where finality of court orders is particularly important," *In re Lawrence*, 293 F.3d 615, 621 (2d Cir. 2002), and that a § 363 sale "protects the reasonable expectations of good faith third-party purchasers by preventing the overturning of a completed sale," *In re Farmland Indus., Inc.*, 408 B.R. 497, 508–09 (B.A.P. 8th Cir. 2009). As the plaintiffs' lawsuit poses no threat to the finality of the bankruptcy court's orders, allowing that lawsuit to proceed will do no violence to these principles.

## CONCLUSION

For the foregoing reasons, the district court's decision to dismiss the case on the basis of res judicata is REVERSED, the judgment is VACATED, and the case is REMANDED to the district court for further proceedings consistent with this opinion.